Hazel GREEN

v.

ROBERTSHAW–FULTON CONTROLS COMPANY, Rheem Manufacturing Company.

No. TH 61–C–16.

United States District Court
S. D. Indiana,
Terre Haute Division.

Jan. 5, 1962.

118

David E. Rosenfeld, of Rosenfeld & Wolfe, Terre Haute, Ind., for plaintiff.

Hugh E. Reynolds of Locke, Reynolds, Boyd & Weisell, Indianapolis, Ind., for Robertshaw-Fulton Controls Company.

James E. Rocap, of Rocap, Rocap & Reese, Indianapolis, Ind., for Rheem Manufacturing Company.

STECKLER, Chief Judge.

This is an action for personal injuries in the nature of bodily burns allegedly suffered on August 4, 1960, as a result of a gas explosion which occurred while plaintiff was attempting to light an automatic gas hot water heater in the basement of her home. It is alleged that defendant, Robertshaw-Fulton Controls Company, manufactured the gas control device on the hot water heater and that the hot water heater with the gas control assembly incorporated as a part thereof was manufactured by the defendant, Rheem Manufacturing Company. The complaint alleges that the defendants were negligent as set forth in the complaint in the manufacture and sale of the automatic gas control assembly and the hot water heater, and as a proximate result thereof plaintiff sustained the injuries and damages complained of.

The defendant, Rheem Manufacturing Company, filed a motion to dismiss the cause of action as to it, or in lieu thereof to quash the return of service of process on the grounds that "(1) the court lacks jurisdiction over the person of defendant, Rheem Manufacturing Company, or in the alternative, (2) service of process on defendant as shown by the affidavit of G. W. Mallatratt, Vice President of Rheem Manufacturing Company, * * *." [1]

For brevity, Rheem Manufacturing Company will be referred to merely as "Rheem," or "defendant Rheem."

The record shows that the summons issued against Rheem was served on the Secretary of State of the State of Indiana pursuant to Ind.Ann.Stat. § 25–316 (1960) [2] and Rule 4(d) (7), Fed.R.Civ.P., 28 U.S.C. (1960), validating service of process on a foreign corporation when made in accordance with a state statute. In its pertinent parts, Section 25–316 of the Indiana statute provides as follows:

"The engaging in any transaction or the doing of any business in this state by any foreign corporation not licensed nor admitted to do business in this state under any existing act or any act hereafter enacted shall be deemed equivalent to an appointment by such foreign corporation of the secretary of state, or his successor in office, to be the true and lawful attorney and agent of such foreign corporation upon whom may be served all lawful processes, writs, notices, or orders in any action or proceeding against such foreign corporation arising or growing out of, directly or indirectly, any act or thing done by such corporation within the state of Indiana. The engaging in any transaction or the doing of any business in this state by any

[1]. The affidavit states, inter alia, that for many years Rheem Manufacturing Company was, and presently is, a corporation organized and existing under the laws of the State of California, with its principal place of business and offices located at 400 Park Avenue, New York, New York. It states that the corporation has never been licensed nor admitted to do business in the State of Indiana; that products of the company are sold to persons and corporations for distribution throughout Indiana by independent distributors, none of whom are agents, servants or employees of Rheem Manufacturing Company; that contracts for the purchase of such products by said independent distributors are not entered into

in the State of Indiana; that the corporation does not have, nor at any time during the years 1960 or 1961, did it have, maintain, or operate, any office within the State of Indiana, nor did it have any assets, bank accounts, solicitors for business, or salesmen, located in Indiana, nor did it maintain any direct contact with any customers within the State of Indiana; that title to all products sold by the company passed outside the State of Indiana, and that Rheem Manufacturing Company has never had any contractual relationship with the plaintiff.

2. Hereinafter sometimes cited as "Section 25–316."

foreign corporation not licensed nor admitted to do business in this state under any existing act or any act hereafter enacted shall be significant of the agreement of such foreign corporation that any such process, writ, notice, or order against it, which is so served, shall be of the same legal force and effect as if served upon a designated resident agent of such foreign corporation. * * * "

As to the method of serving process and notifying the foreign corporation of the pendency of an action, the statute provides that the service shall be made by leaving a duplicate copy thereof with a fee of one dollar with the Secretary of State, or in his office, and that such service shall be sufficient service upon the foreign corporation, provided that a notice thereof and a copy are forthwith sent by registered mail with return receipt requested to the foreign corporation at the principal office of such foreign corporation designated in the articles of incorporation. The record shows compliance with this provision of the statute in that the return receipt was signed by Mr. Mallatratt at the company's New York office.[3]

Thus, Rheem is not questioning the adequacy of the notice. Its basic premise is, merely because it had solicitors, or sales representatives, in Indiana, soliciting orders for its products, does not make it subject to service of process under Section 25–316, nor make it amenable to suit in an action for a judgment *in personam* in this state.

In the memorandum in support of the motion, Rheem cites and relies on the Seventh Circuit decision in the case of Schmidt v. Esquire, Inc., 210 F.2d 908 (7th Cir.), cert. denied, Schmidt v. Crowell-Collier Publishing Co., 348 U.S. 819, 75 S.Ct. 31, 99 L.Ed. 646 (1954).

It states that that case comes closest to construing Section 25–316, but adds, unfortunately the statute has never been fully construed by the courts of Indiana.

The plaintiff, on the other hand, cites and relies on the approach adopted in the famous case of International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Reliance is also placed on the reasoning in Smyth v. Twin State Improvement Corp., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193 (1951) and similar "tortious act" cases. Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961); Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957). See also Annot. 78 A.L.R.2d 397 (1961).

Since the motion presents questions of fact, the case was set for a hearing limited to the issue of whether at the time of the filing of the action and prior thereto, Rheem was "engaged in any transaction or the doing of any business" in the State of Indiana within the meaning of Section 25–316, as such terms are construed in a jurisdictional sense as to foreign corporations in actions *in personam*.

From the evidence the court finds the following:

### FINDINGS OF FACT

1. The defendant Rheem is a corporation organized and existing under the laws of California, with its principal office at 400 Park Avenue, New York City, New York, with midwest sales offices and manufacturing plant at 7600 South Kedzie, Chicago, Illinois.

2. The corporation has never been, and is not now, admitted, nor licensed, to do business in the State of Indiana under any of the laws of Indiana.

3. Aside from electronic manufacturing operations on the West Coast, Rheem has two divisions whose products have

---

3. Notice to the "home office" of the corporation is sufficient to meet the requirement of the due process clause that notice be given. See International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Traveler's Health Ass'n v. Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950).

been sold since "the early forties," and currently are being sold, in the State of Indiana in a systematic and continuous sales program. These divisions are the Home Products Division, and Container Division.

4. The Home Products Division manufactures and sells plumbing fixtures, hot water heaters, warm air furnaces, and air conditioners to so-called wholesale distributors in Indiana. There are approximately ten of these, who sell to retailers and plumbing and heating contractors.

5. The wholesalers to whom Rheem sells its home products are independent distributors. None of the distributors are on the pay roll of Rheem and none of them are financed by Rheem.

6. Rheem has no written contracts, no franchise agreements, and no exclusive dealership agreements with any of the wholesale distributors in Indiana.

7. It has no office, no telephone listing, no bank account, no warehouse, and no showroom in Indiana.

8. No direct sales are made to home owners, nor to retailers.

9. The distributors are not limited to the sale of Rheem products.

10. Distributors in the Hammond and Gary area of Indiana are served by sales representatives from Chicago. The sales representative serving the remainder of Indiana is under the supervision of the Chicago office, though he resides in Louisville, Kentucky. He calls on the distributors at least once a month, and some of them twice, "depending on where they are and how much business they do with [the defendant Rheem] * * *." (Testimony of John J. Nangle, Office Administrator, in Charge of Systems and Procedures, Customer Relations, Home Products Division. [Record, p. 22.].)

11. The sales representatives are salaried personnel; they travel in personally owned automobiles—at company expense, and enjoy a "modest bonus" for meritorious sales achievements.

12. Sales are promoted, in part, by the sales representatives assisting the distributors in arranging the latter's displays, in traveling with salesmen of the distributors to call on customers of the distributors, such as dealers, retailers, plumbing contractors, and home builders.

13. The duties of the sales representative are to "promote" and sell products of the Home Products Division, and gain acceptance of them through architects, engineers, plumbing contractors, and distributors. His primary responsibility is with the distributor, but if the wholesale distributor wants him to travel with the wholesaler salesman to call on plumbing contractors in the interest of Rheem products, the sales representative does so. Catalogues showing models and suggested prices are provided the distributor. It is the sales representative's duty to see to it that the catalogues are kept up to date with the changes in models and suggested prices, by providing new catalogue pages, and what publicity the company has on the changes.

In the words of Mr. Nangle (Record, pp. 33, 34), the sales representative's duties are:

"* * * to promote and sell products of the Home Products Division to wholesalers who in turn sell them to dealers, who in turn sell them to consumers and to accomplish this he works primarily with the wholesalers. To be sure that they maintain adequate stocks of our products. But he also is expected to make periodic calls upon people like architects, home—home builders. And as time permits, which gives him quite a little bit to do when he travels two or three states, I would—I would say that our territory salesman spends most of his time with the wholesaler or with the wholesaler's purchasing agent, or wholesaler's individual salesmen. And by that I mean that he travels with them to call on plumbers. Now, it's also within the scope of his

responsibilities to hold meetings periodically. To display and explain new products, or to re-emphasize features of existing products to wholesalers, representatives, wholesaler—salesmen."

In response to a question by counsel for plaintiff to the witness concerning the direct contact with the distributors' salesmen in order to give the distributors' salesmen sales promotion guidance, the witness stated:

"We prefer to have the wholesaler management give it to his salesmen. But considering the multitude of products that the average—sells, they like to have our men do it to relieve them of that responsibility." (Record, p. 35.)

14. When deemed warranted, if complaints are received from consumers, the ultimate purchasers, the defendant Rheem will send a service man from Chicago to accompany a plumber to check the complaint and effect a remedy.

15. The defendant Rheem maintains a suggested price list for the resale by wholesalers of its home products and it frowns upon price cutting and on occasions it has terminated its dealings with wholesalers found guilty of price cutting, which the defendant deems unethical.

16. Rheem has advertised in national magazines with circulation in Indiana, however, in view of the company's present profit position, there is no national advertising being done.

17. In a limited way the sales representatives supervise the method in which the distributor displays the company's products.

18. Orders for products of the Home Products Division are either received by mail at the Chicago office, or called in by telephone, or, they are given to the sales representatives who mail them to the company's Chicago office.

19. All orders are accepted or rejected at the corporation's Chicago office and are shipped f. o. b. Chicago. The sales are made on open account.

20. For a period of approximately five years, the Home Products Division has sold approximately $600,000.00 worth of its products annually to wholesale distributors in Indiana. This represents annual sales of approximately 10,000 hot water heaters for approximately $500,-000.00, and plumbing fixtures, warm air furnaces, and air conditioners, for approximately $100,000.00.

21. The Container Division during the years in question employed, and currently employs, a salaried sales representative who travels into the State of Indiana to make direct calls on consumers of the products of the Container Division. The Container Division manufactures cylindrical steel containers and drums for industrial users, such as paint and varnish manufacturers, food and drug processors, the lubricant and oil refining industry, and the chemical industry.

22. The method of selling and servicing the customers of the Container Division differs from that which obtains with respect to the distributors served by the Home Products Division. The Container Division customers order "to specification." In other words, "they don't just order a drum, they order their drum to their specification." (Testimony of Richard H. Morrison, a sales representative of Container Division. [Record, p. 46.].) The Container Division then engineers and manufactures the drum to the customer's specification. Usually these customers will select two sources of supply, and if Rheem is "able to meet their requirements consistently, and be a reliable source to them," the customers consider Rheem as a source of supply. Primarily, the sales representatives "service" these "accounts." Though they quote prices, they take no orders, and they carry no order blanks. All orders are mailed or telephoned to Chicago, and are accepted or rejected in Chicago, and the company maintains no warehouse

in Indiana in connection with the activities of the Container Division.

23. All shipments into Indiana are by common carrier, and all sales are made f. o. b. Chicago on open account.

24. What is meant by "servicing an account" may be described generally as follows: The sales representative confers with the customer with regard to the customer's particular needs. He tells the customer the advantages of a particular container and how it may be made most useful in the customer's requirements. In the case of a new customer, he explains all the service the company has to offer toward filling the customer's requirements. He tells a customer whether it is "over packaging," and he follows through to check on any complaints in the carloading and arrival of shipments at the consumer's factory. He will also visit the refineries and other companies and inspect and check with the people who are actually using the drum to see if everything is all right and if there is something that could be done to make the use of the product easier.

The follow-up work performed by the sales representative at the manufacturing plants and refineries is a requirement of his duties. The "servicing" of an account appears to encompass more than a mere solicitation of orders. And in this connection, perhaps it is well to quote again from the record. Mr. Morrison's testimony at pages 54–55 of the Record points this up:—

"Q. Now you do business with Standard Oil Company of Indiana?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. And you personally go into their buying office and discuss the sale of your products with their buyer?

"A. That is a special situation, as far as Standard Oil. There were a couple of us that handle that account. And I service the account, at the Whiting Refinery. I do not—in their purchasing office, which is in Chicago.

"Q. What do you do with the Standard Oil account, for example?

"A. What do I do?

"Q. Yes.

"A. I service it, to see that there are no problems. When we make shipments out there, I periodically contact the people who are actually using the drum in the refinery, to see if—if everything is all right, or if they are satisfied with the way we might be shipping them. If we're loading the cars properly, or if there's something that we can do to make their—make their use of our product easier.

"Q. What other petroleum accounts do you have in the State of Indiana outside of Standard Oil?

"A. I do the same thing with Sinclair Refining, East Chicago."

The evidence shows that the Container Division also sells and services the D–X Lubricant Company.

25. The Container Division advertises in trade journals which are distributed in Indiana.

26. The Container Division for the past five years has sold its products to purchasers in Indiana in the amount of approximately $500,000.00 per year.

Thus, the combined sales of the Home Products Division and the Container Division in Indiana has averaged in excess of $1,000,000.00 annually during the past five years. And at all times during such period, the defendant Rheem had substantial accounts receivable existing in Indiana.

27. The services of Rheem's sales representatives in both divisions exceed mere solicitation of orders. They themselves are more than mere salesmen; they are, in addition, service representatives, extending a complete promotional service in furtherance of the company's

business. These activities were systematic and continuous throughout a number of years and resulted in a large volume of business as heretofore indicated.

Memorandum of Conclusions of Law

Rheem's argument is that the extent of its "contact" with the State of Indiana is not such as to bring it within the reach of the holding in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and consequently is distinguishable from that case.

█ Defendant says the evidence shows that it has no warehouse, inventory, bank account, office, officers, manufacturing plant, contracts, or corporate meetings in Indiana, and that it pays no property tax and is not qualified nor licensed to do business in Indiana. Stress is laid on the fact that even though Rheem enjoys average annual sales in Indiana in an approximate amount of $1,000,000.00, the goods are sold on open account f. o. b. Chicago, Illinois, and not on consignment. Also, that since Rheem is not licensed or admitted to do business in Indiana, the accounts receivable, payable in Chicago, are not collectible in Indiana by reason of Ind.Ann.Stat. § 25–314 (1960).[4]

Rheem says that the only contact the corporation has with Indiana arises from the fact that it has two salesmen, or solicitors, one for its Home Products Division, the other for its Container Division, who come into Indiana for the purpose of "promoting Rheem products."[5] It is emphasized that they do not live in Indiana, nor have authority to accept or reject any orders for their products; that they act more in the capacity of intermediaries between the user on the one hand and the manufacturing company on the other hand. It is stated that they are salaried and on an expense account; that they drive their own automobiles and receive no commission from any goods sold in their territory; that they collect no money, and if an order is given them, they transmit it to Chicago without confirming or denying the order.

Rheem further argues, after the sale of goods in Indiana, Rheem exercises no control over the pricing, display, sale or installment thereof. It admits, "in the interest of good business practice," it suggests a sale price for its products; that it seeks distributors with ample display space, and if a distributor falls into ill repute, it ceases to use the facilities of that distributor. It is claimed the evidence shows no direct advertising, group sales meetings, company sponsored displays at fairs, home shows, or the like, no exclusive dealership or territories, and no control by the company over distributors as far as pricing of the products in the local market is concerned.

Thus, absent a specific construction of Section 25–316, Rheem says it is not amenable to service of process under this section, nor to suit in Indiana, because the mere solicitation of orders for the sale of its products does not amount to "doing business" in the state. It cites Mutual Mfg. Co. v. Alspaugh, 174 Ind. 381, 91 N.E. 504, reh. denied, 92 N.E. 113

---

4. This statute is a penalty statute. It subjects a foreign corporation to a penalty of up to $10,000.00 for transacting business in Indiana without a certificate of admission. In addition, it precludes the violator from maintaining suit in the Indiana courts on any demand, whether arising out of contract or tort. However, it does not apply to interstate transactions. Stolz-Wicks, Inc. v. Commercial Television Service Co., 271 F.2d 586 (7th Cir. 1959). Nor does it prevent suit where the violator complies with the registration provisions prior to bringing suit. See discussion of Indiana law, infra.

5. The evidence indicates more than two representatives render service in Indiana. See Finding No. 10. The assertions of counsel regarding the facts are merely repeated in order to bring the issues into better focus, and are not to be considered conclusive where they do not coincide with the court's findings.

(1910); Schmidt v. Esquire, Inc., 210 F.2d 908 (7th Cir.), cert. denied, Schmidt v. Crowell-Collier Publishing Co., 348 U.S. 819, 75 S.Ct. 31, 99 L.Ed. 646 (1954). It also says, "The Supreme Court of the United States on many occasions held that the: 'mere solicitation of business by an agent does not constitute the doing of business as to subject a foreign corporation to local jurisdiction.' Green v. Chicago, B. & Q. Ry. Co., 205 U.S. 530, [27 S.Ct. 595, 51 L.Ed. 916 (1907)], and Philadelphia and Reading Ry. Co. v. McKibbin, [243 U.S. 264, 37 S.Ct. 280, 61 L.Ed. 710 (1917)]."

Finally, defendant says that the case relied on by plaintiff, Gray v. American Radiator and Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961), is unsupported by International Shoe or any other law and certainly does not control in this state or this circuit, citing the Esquire and Alspaugh cases.

Plaintiff, on the other hand, argues that Section 25–316 "gives the state courts of Indiana, in respect to causes of action, 'arising or growing out of, directly or indirectly, any act or thing done * * *' by the unlicensed foreign corporation, *in personam* jurisdiction, if the foreign corporation was 'engaged in any transaction or the doing of any business' in Indiana."

Plaintiff states these questions of law are posed:

"1. Did the defendant, not present within the State of Indiana, have certain minimum contacts with it so as not to offend traditional notions of fair play and substantial justice?

"2. Is defendant 'present' in the State of Indiana? and

"3. Would defendant be unreasonably inconvenienced if it were required to defend the pending action in a forum away from its home or principal place of business?"

In their brief, in reliance on International Shoe Co. v. Washington, supra, plaintiff's counsel state that the facts "establish without controversy that defendant has more than minimum contacts with the State of Indiana"; that defendant sells thousands of its units which it ships into Indiana for the obvious purpose and intent of either being resold or consumed by residents of the State of Indiana; and that all the evidence with respect to the defective condition of the water heater, the injuries sustained, the medical testimony, and all other witnesses with few exceptions, are in Indiana. They ask, "Would it be reasonable or just to require this plaintiff, who is seriously and permanently maimed, to be forced to travel to another jurisdiction?" They assert, "to do so offends one's sense of fairness and fair play." They say further, "substantial justice requires that defendant, by its negligence, having placed the hot water heater in the State of Indiana, should be required to defend this action in this jurisdiction."

Referring to the recent case of Gray v. American Radiator & Standard Sanitary Corp., supra, they state that in that case there was no evidence, as there is here, of a continuous and regular course of business within the State of Illinois; and no evidence that defendant knew that the appliance in question was intended for delivery in the State of Illinois. They point out the court there held, nevertheless, that the commission of a tort in the manufacture of a hot water heater which occurred outside the State of Illinois made the defendant amenable to process within the State of Illinois. In the case here, counsel say the evidence shows the defendant sells 10,000 hot water heaters a year in Indiana, and that its salesmen who come into the state, come for that very purpose. They reason that "if substantial justice required the defendant in the Gray case to subject itself to litigation in Illinois under the facts of that case, then, fair play and substantial justice requires this Court to impose jurisdiction upon the defendant."

They further state that Schmidt v. Esquire, Inc., supra, cited and relied on

by the defendant, is readily distinguishable from the facts of this case. It is said the Esquire case turned on the principles announced in Cannon v. Time, Inc., 115 F.2d 423 (4th Cir.1940), where the court held that the news company there in question was an independent contractor, doing business for its own account, not as an agent of Time, and therefore, Time was not doing business within the state and was not amenable to suit. Quoting from the Esquire case, plaintiff states—

"As the court in the Esquire Case said—'The Readers Digest Community representatives are under no supervision, direction or control, they conform to no pre-arranged schedule or routine, they solicit or not as it suits their opportunity or inclination. Certainly, they are not agents of Readers Digest within the meaning of all that term implies.'"

They go on to say that in the instant case, the defendant Rheem "is here in person by its direct employees, who carry on continuous solicitation of business and servicing of the account." Further, that they are "agents of the defendant and not independent contractors. * * *"

Counsel continue by stating that the trend of modern cases clearly indicates a change in the traditional concept of when a corporation is "present," and thus, amenable to process.

They say Section 25–316 was adopted in 1939; that the statute was obviously passed to prevent "the abuse which defendant here seeks to subject the plaintiff"; and that "the employment of the term 'any transaction' indicates a minimum of contact within the State of Indiana, subject only to due process." They conclude, "Certainly the sale of ten thousand heaters and thousands of containers is more than 'any transaction,'" and that this case is, therefore, indistinguishable from the International Shoe case.

The determination of the question whether a foreign corporation is doing business within a state or not has always been a matter of great difficulty and extreme nicety. No all-embracing rule as to what is doing business has been laid down. The question is one of fact, and it is to be determined largely according to the facts of each individual case rather than by the application of fixed, definite, and precise rules. 20 C.J.S. Corporations § 1920 (1940); Fletcher, Private Corporations § 8733 (perm. ed. rev. repl. 1955) [6]. It is one of the most difficult, time consuming problems with which the district courts are confronted. One court has said that perhaps there is no question in law more complicated or confused than the one involving and attempting to define "doing business" within a particular territory or jurisdiction. Snowden v. Masonic Life Ass'n of Western New York, 244 Ky. 286, 50 S.W.2d 569, 570 (1932). The author, in Fletcher, § 8712, pp. 394, 395, says—

"As the courts have said in a number of decisions: What is meant by doing business in a given state or other locality is something approached from so many angles that the subject appears a mass of confusion. 'Doing business' for purposes of taxation, doing it within a statute requiring licenses, and doing enough business to justify the service of process are quite different things. The use of the same phrase makes confusion. That is to say, one of the causes of the confusion and lack of harmony in the cases is that the test of doing business has been variously applied to three different legal purposes: (1) The necessity of a license under the licensing statutes; (2) the liability to a tax on corporate activities; (3) the subjection to service of process."

Thus, it is necessary to keep in mind the distinction between the classes of

---

6. Hereinafter sometimes referred to as "Fletcher."

cases determining on the one hand the nature and extent of the activities of a foreign corporation in a state to subject it to service of process therein on the ground that it is "doing business" there, and the rules applied in construing the terms "doing business" and "transacting business" in qualifying statutes, and licensing and tax laws. Bendix Home Appliances v. Radio Accessories Co., 129 F.2d 177 (8th Cir.1942). In that case it was held that the activities of a foreign corporation which are sufficient to make it amenable to process within the state by service upon an officer of the state or upon the corporation may be less than those required to subject the corporation to provisions of the state's licensing and taxation statutes. See also, 20 C.J.S. Corporations § 1920; 23 Am.Jur. Foreign Corporations § 362 (1939); International Harvester Co. v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479 (1914); Liquid Veneer Corp. v. Smuckler, 90 F.2d 196 (9th Cir.1937); Wilson v. Hudson Motor Car Co., 28 F.2d 347 (D.Neb.1928); Rendleman v. Niagara Sprayer Co., 16 F.2d 122 (E.D.Ill.1925); Willis v. National Mineral Co., 176 Okl. 193, 55 P.2d 449 (1936).

Compounding the confusion in this area is the failure to distinguish the pre-Erie cases wherein general federal law applied and those cases coming subsequent to the adoption of the Erie Doctrine.[7] Likewise, the division of opinion as to whether the question is governed by state or federal law; whether the question is procedural or substantive; or whether the question is governed by both state and federal law. As to the latter, the view followed, frequently depends upon whether the question is submitted to a state, or a federal court. Each looks to the law of the other, and unless extreme care is exercised, a situation similar to that to which the Doctrine of Renvoi is apropos, is created.[8] Compare Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). There the state court apparently relied on an interpretation of the due process clause of the fourteenth amendment as prohibiting the state from granting relief against a foreign corporation, whereas the Supreme Court, without reaching state policy, concluded it would not violate federal due process for the state either to take or decline jurisdiction of the foreign corporation in the proceedings.

Under the Erie Doctrine, where federal jurisdiction is based on diversity of citizenship, a federal court is in effect only another court of the state in which it sits, and applies the same law that would be applied if the action were brought in the state courts. Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956); Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1465, 89 L.Ed. 2079 (1945). See also 36 C.J.S. Federal Courts § 165(1).

As previously intimated, some courts have taken the view that federal law governs as to whether a foreign corporation is doing business in a state so as to be amenable to the service of the process of the federal court in a diversity case. See cases cited, 36 C.J.S. Federal Courts § 190, p. 525, n. 55. However, in this circuit it is settled that the question is one of substantive law, and is controlled by state law. Schmidt v. Esquire, 210 F.2d 908 (7th Cir.) cert. denied Schmidt v. Crowell-Collier Publishing Co., 348 U.S. 819, 75 S.Ct. 31, 99 L.Ed. 646 (1954); Canvas Fabricators, Inc. v. William E. Hooper & Sons Co., 199 F.2d 485 (7th Cir. 1952). See also Rensing v. Turner Aviation Corp., 166 F.Supp. 790 (N.D.Ill.1958). Other circuits having

---

7. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

8. *Renvoi*—"A doctrine under which the court in resorting to a foreign law adopts the rules of the foreign law as to conflict of laws, which rules may in turn refer the court back to the law of the forum." Black, Law Dictionary, p. 1462 (4th Ed. 1951).

spoken on the question agree with the Seventh Circuit.[9]

■ As stated at the outset, the record shows that the summons issued against Rheem was served on the Secretary of State of the State of Indiana pursuant to Section 25–316 and Rule 4(d)(7), 28 U.S.C. (1960). Under Rule 4(d)(7), service may be made on a foreign corporation in the manner prescribed by any statute of the United States, or in the manner prescribed by the law of the state in which service is made for the service of summons or other like process upon any such defendant in an action brought in the courts of general jurisdiction of that state. Under this Rule, where no federal statute providing for service of process is applicable, whether service on a representative of a foreign corporation is valid depends upon whether such service is made in compliance with state law. 35A C.J.S. Federal Civil Procedure § 216. Since, in the case at hand, there is no federal statute applicable, we must look to Section 25–316.

Though defendant Rheem is not questioning the adequacy of the notice it received, it is questioning the statute's applicability, asserting that the corporation was not "doing business" in Indiana within the meaning of the statute. And though it is not stated in so many words, the inference is made that to apply the statute as construed by plaintiff would be violative of the due process clause of the fourteenth amendment.

■ The application of a state statute authorizing service on a foreign corporation doing business in the state is limited by constitutional requirements of due process as interpreted by the Supreme Court, the final arbiter. Therefore, if the federal court finds that the courts of the state would exercise jurisdiction, it must next determine whether the exercise of such power offends due process of law. This simply means, how far can a state go in extending its jurisdiction over a foreign corporation. In the recent case of Orton v. Woods Oil & Gas Co., 249 F.2d 198 (7th Cir. 1957), the court held that the question whether a foreign corporation was engaged in "the transaction of any business" within the State of Illinois was coterminous with the due process clause of the fourteenth amendment. And in Kaye-Martin v. Brooks, 267 F.2d 394 (7th Cir.), cert. denied, 361 U.S. 832, 80 S.Ct. 84, 4 L.Ed.2d 75 (1959), the court said, "Although the phrase 'transaction of any business within this State' is as broad as constitutional authority will permit it poses a problem of statutory construction within the constitutional framework and its application to the factual background of each individual case." See also Partin v. Michaels Art Bronze Co., 202 F.2d 541 (3d Cir. 1953); Rosenthal v. Frankfort Distillers Corp., 193 F.2d 137 (5th Cir. 1951); Pulson v. American Rolling Mill Co., 170 F.2d 193 (1st Cir. 1948); Rensing v. Turner Aviation Corp., supra; 35A C.J.S. Federal Civil Procedure § 216; 36 C.J.S. Federal Courts § 190; Fletcher, § 8733.

■ To define that constitutional framework, would, as stated by the court in the Kaye-Martin case, serve no purpose other than to unnecessarily extend this memorandum. In this regard, suffice it to reiterate, the courts are to consider all that is to be found in the decisions anent the evolution of service on nonresident defendants in *in personam* actions from Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1877), through International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); McGee v.

---

9. Stanga v. McCormick Shipping Corp., 268 F.2d 544 (5th Cir. 1959); Florio v. Powder Power Tool Corp., 248 F.2d 367 (3d Cir. 1957); Partin v. Michaels Art Bronze Co., 202 F.2d 541 (3d Cir. 1953); Albritton v. General Factors Corp., 201 F.2d 138 (5th Cir. 1953); Rosenthal v. Frankfort Distillers Corp., 193 F.2d 137

(5th Cir. 1951); Steinway v. Majestic Amusement Co., 179 F.2d 681, 18 A.L.R. 2d 479 (10th Cir. 1949), cert. denied 339 U.S. 947, 70 S.Ct. 802, 94 L.Ed. 1362 (1950); Kelley v. Delaware, L. & W. R. Co., 170 F.2d 195 (1st Cir. 1948), cert. denied 336 U.S. 939, 69 S.Ct. 742, 93 L.Ed. 1097 (1949).

International Life Ins. Co., 355 U.S. 220 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); and Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). From these pronouncements, it will be found that it is now the established law that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting *activities* within the forum State, thus invoking the benefits and protections of its laws," [10] and that "[a foreign defendant] have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " [11] Kaye-Martin v. Brooks, supra, 267 F.2d at 397. (Emphasis added.)

The problem of the range of state jurisdiction over nonresidents [12] and foreign corporations [13] has been discussed frequently in recent literature. Here in our own circuit,[14] and in this state,[15] scholarly articles have been written tracing the influence of the changing interpretation given the due process clause of the fourteenth amendment to the Federal Constitution.

The statute here in question, Section 25–316, has never been interpreted by an Indiana court. Nor did the Court of Appeals attempt to construe the statute in the Esquire decision. The court said:

"We have not been cited to, nor have we found, any reported decisions of the Indiana courts construing the statute involved in the instant case. *However, we do not think it necessary to decide whether or not the Indiana statute is as broad as the International Shoe doctrine would permit.* Whether the question is one of due process, or state law, we think the District Court correctly decided the question on the principles announced in Cannon v. Time, Inc., * * *." 210 F.2d at 916. (Emphasis added.)

The decision in Cannon v. Time, Inc., 115 F.2d 423 (4th Cir. 1940), turned on the question of agency and control, the court holding notwithstanding the solicitation and collection for subscriptions, the news company was an independent contractor doing business for its own account and not as an agent of Time, Inc., and accordingly, Time, Inc. was found not to be doing business within the state, and therefore not amenable to suit in the local forum.[16] Aside from the issue of

---

10. Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

11. International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

12. Annot., 78 A.L.R.2d 397, n. 1 (1961).

13. Annot., 25 A.L.R.2d 1202 (1952).

14. See the discussion and articles cited in Orton v. Woods Oil & Gas Co., 249 F.2d 198 (7th Cir. 1957), (discussing Illinois law). See also Edwin Raphael Co. v. Maharam Fabrics Corp., 283 F. 2d 310 (7th Cir. 1960); Insull v. New York, World-Telegram Corp., 273 F.2d 166 (7th Cir. 1959); 362 U.S. 942, 80 S.Ct. 807, 4 L.Ed.2d 770 (1960); Trippe Mfg. Co. v. Spencer Gifts, Inc., 270 F. 2d 821 (7th Cir. 1959); National Gas Appliance Corp. v. AB Electrolux, 270 F.2d 472, 473 (7th Cir. 1959); Kaye-Martin v. Brooks, 267 F.2d 394 (7th

Cir.), cert. denied, 361 U.S. 832, 80 S.Ct. 84, 4 L.Ed.2d 75 (1959).

15. See Note, "Foreign Corporations: The Interrelation of Jurisdiction and Qualification." 33 Ind.L.J. 358 (1958).

16. The defendant Rheem has also cited and relied on Philadelphia and Reading Ry. Co. v. McKibbin, 243 U.S. 264, 37 S.Ct. 280, 61 L.Ed. 710 (1917). The McKibbin case, and two of its progeny, Travis v. Fuqua, 121 Ind.App. 440, 97 N.E.2d 867 (1951) and Cannon v. Time, Inc., 115 F.2d 423 (4th Cir. 1940), the latter upon which Esquire and its companion case, Schmidt v. Reader's Digest Ass'n, Inc., 210 F.2d 908, cert. denied, Schmidt v. Crowell-Collier Publishing Co., 348 U.S. 819, 75 S.Ct. 31, 99 L.Ed. 646 (1954), turned, are all cases with which this court is in full agreement. All have one thing in common, that is, in each case the so-called "agent" of the defendant was an independent contractor,

agency, the court, in the Cannon case, said that if it be deemed that the procurement of subscriptions amounted to the doing of business within the state, the business was not of sufficient volume or importance to warrant the inference that the corporation itself was present within the state by its duly authorized officers or agents upon whom service of process could be had.

The Esquire case did not determine that Mutual Mfg. Co. v. Alspaugh, 174 Ind. 381, 91 N.E. 504, reh. denied, 92 N.E. 113 (1910), would govern the application of Section 25-316. Nor are the earlier Indiana cases dispositive. However, they are indicative of this state's policy in dealing with foreign corporations.[17] And at this point, in order to keep clearly in mind what Alspaugh

---

not subject to the control of the defendant in the manner or method of accomplishing the result contracted for. In McKibbin and Fuqua, the "agents" were ticket agents of other common carriers. In Esquire, another independent foreign corporation in the circulation business. In Reader's Digest, "community representatives," not subject to the control of defendant, and in Cannon, an independent news company, newsstands, drug stores, and department stores. Compare WSAZ, Inc. v. Lyons, 254 F.2d 242, 246 (6th Cir. 1958). While such defendants might under some circumstances be estopped to dispute the agency, as against one dealing with the "agent," such estoppel does not prevent the defendants from showing their true position as against a third person. Compare Cannon v. Time, Inc., 115 F.2d 423, 425 (4th Cir. 1940). The court in Cannon, discussing the solicitations and collections within the state, distinguished the holding in International Harvester Co. of America v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479 (1914). The court pointed out that the solicitation in the International Harvester case (a case in which the foreign corporation carried on a continuous course of business of large volume within the state of the forum, by solicitation of orders, delivery of goods, acceptance of checks and drafts and the discounting of them within the state, all of which, taken together, it was held, amounted to doing business within the state) was of a very different category than the solicitation of subscriptions to magazines, even though the solicitors be authorized to collect for the subscriptions. 115 F.2d at 425. With such, and similar circumstances, there is little wonder that the courts in Esquire and Fuqua, held as they did, following the McKibbin and Cannon lead. The *ratio decidendi* is not only legally sound, but seems inescapable. Cf. Evansville Courier Co. v. United Press, 74 F. 918 (C.C.D. Ind.1896). But compare Cosper v. Smith

& Wesson Arms Co., 53 Cal.2d 77, 346 P.2d 409 (1959), cert. denied, 362 U.S. 927, 80 S.Ct. 755, 4 L.Ed.2d 746 (1960).

17. The following, among which is the Alspaugh case, are a few of the pertinent cases in which it was found that the failure of the foreign corporation to secure a license did not prevent it from maintaining an action in the state court, for the reason that the foreign corporation was not "doing business" to such an extent as to require imposition of the penalty closing the state courts to the foreign corporation for failure to comply with the qualification statutes. Swarthout v. McDonald Mortgage & Realty Co., 102 Ind.App. 298, 199 N.E. 467 (1931) (single real estate transaction occurring outside state); North Dakota Realty & Inv. Co. v. Abel, 85 Ind.App. 563, 155 N.E. 46 (1927) (holding and foreclosing a second mortgage on Indiana real estate); Vilter Mfg. Co. v. Evans, 86 Ind. App. 144, 154 N.E. 677 (1927) (installation of machinery in state); Mutual Mfg. Co. v. Alspaugh, 174 Ind. 381, 91 N.E. 504, reh. denied, 92 N.E. 113 (1910) (facts not given; appears to be single solicitation in state); Hollowell v. Smith Agricultural Chemical Co., 41 Ind.App. 361, 83 N.E. 772 (1908) (appointment of agent within state).—Other cases have found that the foreign corporate plaintiff was doing business although not qualified and thus could not maintain the action. Peter & Burghard Stone Co. v. Carper, 96 Ind.App. 554, 172 N.E. 319, 775 (1930) (furnished labor and materials for construction; assumed to be doing business, but found that compliance with statute prior to suit permitted plaintiff to maintain suit); United States Construction Co. v. Hamilton Nat. Bank, 73 Ind.App. 149, 126 N.E. 866 (1920) (installation of water sprinkler system and local construction of water tower for same) (overruled on point not here pertinent by Peter & Burghard Stone Co. v. Carper, supra); Lowenmeyer v. Na-

stands for, it would be well to allude again to the distinction between the classes of cases dealing with nonresidents and foreign corporations doing business in Indiana as respects qualification or registration statutes, licensing and tax laws, and amenability to suit, or *in personam* jurisdiction.

When determining whether the Indiana courts should be closed to foreign corporations for failure to comply with the qualification statutes, and when determining whether the revenue derived from Indiana may be taxed by this state, the courts are dealing primarily with the restrictions of the com-

tional Lumber Co., 71 Ind.App. 458, 125 N.E. 67 (1919) (operated retail store in state).

Divergent views of what activity is sufficient within the state so as to permit taxation of receipts from Indiana where the foreign corporation was not qualified to do business in the state are illustrated in Gross Income Tax Division of Indiana v. Surface Combustion Corp., 232 Ind. 100, 111 N.E.2d 50, cert. denied, 346 U.S. 829, 74 S.Ct. 51, 98 L. Ed. 353 (1953) (installation of industrial furnaces within state; held: installation essential to sale, thus was interstate transaction and not taxable); and in Gross Income Tax Division v. Fort Pitt Bridge Works, 227 Ind. 538, 86 N.E.2d 685, 87 N.E.2d 721 (1948) (furnishing steel and erecting industrial building in state; held: activities were local, thus subject to tax).

The only cases found holding that the activity of a nonresident individual, or foreign corporation not admitted to do business, was sufficient to give the Indiana court *in personam* jurisdiction are: United States Health & Acc. Ins. Co. v. Batt, 49 Ind.App. 277, 97 N.E. 195 (1912) (special insurance statute gave jurisdiction on any claim against insurance company); Edwards v. Van Cleave, 47 Ind.App. 347, 94 N.E. 596 (1911) (local broker, held to be, and thus served as, agent of foreign corporation in action by third party beneficiary [real estate salesman] for money withheld by foreign corporation due salesman for sale of real estate in North Dakota; held: foreign corporation was transacting business in Indiana by local broker and service on him was sufficient in suit growing out of business so transacted as to give court *in personam* jurisdiction); Old Wayne Mutual Life Ass'n v. McDonough, 164 Ind. 321, 73 N.E. 703 (1905), rev. 204 U.S. 8, 27 S.Ct. 236, 51 L.Ed. 345 (1907) (foreign corporation had no office, agency, officers, agents or contracts in Pennsylvania; Indiana court held, in suit on Pennsylvania judgment, that Pennsylvania court had *in personam* ju-

risdiction; United States Supreme Court reversed because contract of insurance executed outside Pennsylvania); Rush v. Foos Mfg. Co., 20 Ind.App. 515, 51 N.E. 143 (1898) (facts not given; appeared to be only solicitation; clearly no office in state); Memphis & C. Packet Co. v. Pikey, 142 Ind. 304, 40 N.E. 527 (1895) (operation of boats on Ohio River; stops in Indiana towns on river); Conkey v. Conder, 137 Ind. 441, 37 N.E. 132 (1894) (constructing railroad in state); Rauber v. Whitney, 125 Ind. 216, 25 N.E. 186 (1890); Behn v. Whitney, 125 Ind. 599, 25 N.E. 187 (1890) (operated retail store in state).—All the Indiana cases found, holding the activity not to be sufficient to subject the nonresident individual, or foreign corporation not admitted to do business in this state, to *in personam* jurisdiction are: Travis v. Fuqua, 121 Ind.App. 440, 97 N.E.2d 867 (1951) (tickets for defendant's bus line, wholly without the limits of Indiana, sold by local railway company, construing Ind.Ann.Stat. § 2–703 (1946) ("transaction of business"); International Shoe distinguished on facts and because it involved a corporation); Byers v. Union Cent. Life Ins. Co., 17 Ind.App. 101, 46 N.E. 475 (1897) (statute providing substituted service found to be for benefit of citizens dealing with agents of foreign corporation, thus inapplicable to suit by agent of foreign corporation in action against the corporation) (soundness questioned in United States Health & Acc. Ins. Co. v. Batt, supra, relying on subsequent statute). See also, Chassis-Trak v. Federated Purchaser, Inc., 179 F.Supp. 780 (D.N.J.1960) (failure to comply with mechanics of Section 25–316 found fatal; held statute would violate due process if construed to give jurisdiction in that case, where single transaction occurred); Schmidt v. Esquire, 210 F.2d 908 (7th Cir.) cert. denied 348 U.S. 819, 75 S.Ct. 31, 99 L.Ed. 646 (1954) (court found activity in state done by independent contractors, not agents of defendants) (discussed supra).

merce clause of the Constitution. When determining whether to subject the foreign corporation to service of process in Indiana, the due process clause is primarily involved. In the former, it is the interstate nature of the transactions which prevents a state from regulating and burdening them, see Stolz-Wicks, Inc. v. Commercial Television Service Co., 271 F.2d 586 (7th Cir. 1959) (qualification); Gross Income Tax Division of Indiana v. Surface Combustion Corp., 232 Ind. 100, 111 N.E.2d 50, cert. denied 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353 (1953) (taxation), whereas purely interstate transactions may give a foreign corporation sufficient "minimum contacts" with a state so as to permit a state to subject it to service of process. International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1946). Subjecting a foreign corporation to service of process is not a burden on interstate commerce. International Harvester Co. of America v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479 (1914).

 When the Indiana courts, in cases such as Mutual Mfg. Co. v. Alspaugh, supra, found that a foreign corporation was not "doing business" in Indiana, it should be remembered that they were there dealing with the penalty features of this state's qualification statutes. The present Indiana statute, Ind. Ann.Stat. § 25–314 (1960), which is quite similar to the act under construction in Alspaugh, provides for a penalty up to $10,000.00, and, in addition, closes the courts of this state to a foreign corporation doing business herein without first securing a certificate of admission. It is well established that penalty statutes are to be strictly construed in favor of those sought to be penalized. See 26 I.L.E. Statutes § 175 (1960). Statutes relating to remedies and procedure, on the other hand, should be liberally construed. See 26 I.L.E. Statutes § 177 (1960). The author of the Alspaugh decision, subsequent to that decision, recognized this in Meixell v. American Motor

Car Sales Co., 181 Ind. 153, 103 N.E. 1071 (1914).

The penalty provision closing Indiana courts to foreign corporations violating the qualification provisions is easily avoided. It has been held repeatedly that even though the plaintiff foreign corporation violated the registration provisions in the very transaction upon which it sues, the penalty provided by Section 25–314 will not apply so as to prevent suit if the certificate of admission is secured prior to commencement of the action. Farmers Mutual Hail Ins. Co. of Iowa v. Gorsuch, 123 Ind.App. 264, 110 N.E.2d 344 (1953); Warren Co. v. Exodus, 114 Ind.App. 651, 54 N.E.2d 775 (1944); Peter & Burghard Stone Co. v. Carper, 96 Ind.App. 554, 172 N.E. 319, 775 (1930). Thus, while such a foreign corporation seeking to sue in an Indiana court may control the issue of jurisdiction merely by qualifying prior to suit, it is apparent that an Indiana plaintiff seeking to subject a foreign corporation to suit in this state has no similar ability.

Finally, the qualification statutes presently require, as they did prior to the decision in Alspaugh, that a foreign corporation applying for a certificate of admission, furnish a statement as to the "location of the proposed principal office or place of business within this state." Ind.Ann.Stat. § 25–304(b) (1960); Ind. Acts 1907, ch. 176, § 2, p. 286. This has been interpreted to require that before a foreign corporation could be subjected to the provisions of the qualification statutes, it have a "corporate situs or domicile" in this state. Ops. Ind. Att'y Gen. 133 (1955); 7 I.L.E. Corporations § 304, p. 124 (1958). In fact, the Alspaugh case so held. The court there stated that the registration statutes were "intended to apply to such corporations only as established permanent agencies in this state * * *" and that the qualification statutes do "not apply to cases like the one before us, but to cases where a corporate situs or domicile is sought in this state, or, in the language of the act,

where a 'principal business office' or a permanent agency is located." 174 Ind. at 385, 386, 91 N.E. at 506. Although the facts are not given in the Alspaugh opinion, the language of the court would indicate that the defendant there had engaged in but one transaction, that upon which the suit was based:

"There is a [18] reason in imposing a tax on the property of foreign corporations doing business in this State, or requiring a license to exercise corporate powers or franchises within the State, and in requiring corporations to assent to jurisdiction of our courts as a condition of their rights to resort to them, to equalize the burden of all in the support of government, and in furnishing equal facilities to nonresidents, and to our own citizens in the enforcement of their rights, but to give said statute the application and force insisted upon by appellees—requiring an agent to be appointed [for service of process] in every instance in which a bill of goods is sold—would be so manifestly unreasonable that only the legislative declaration to that effect would justify such construction." 174 Ind. at 387, 91 N.E. at 506.

Even if it be assumed that the solicitation in Alspaugh was continuous in nature, and involved more than an isolated transaction, primarily that case stands for the proposition that a foreign corporation is not subject to the registration provisions unless it has acquired a "corporate situs or domicile" within this state. Clearly the mere solicitation of business without more could never cause a corporation to acquire a corporate situs or domicile. This is pointed up by another Attorney General's Opinion. In Ops. Ind. Att'y Gen. 136 (1929–30); 7

I.L.E. Corporations § 304, p. 125 (1958), after noting that his opinion dealt with the question of qualification and not with amenability to suit, the Attorney General concluded that where a foreign corporation, which had no office in Indiana, sent salesmen into the state to solicit orders which were approved outside the state the corporation would *not* be subject to regulation, but that where the foreign corporation had an office and assets in this state it *was* subject to regulation *notwithstanding* the fact that the orders were always approved outside the state.

The statute here under construction, Section 25–316, providing for service of process on foreign corporations makes no reference to a requirement of a principal business office in this state. The provisions of the statute appear to be directed precisely at the situation where the foreign corporation does not have a corporate situs or domicile in this state, but is in fact "engaging in any transaction or the doing of any business in this state."

In this jurisdiction the interpretation of the phrase "doing business" in the penalty statute in the Alspaugh case is cited repeatedly in cases involving a foreign corporation's amenability to service in an action *in personam*. It is cited indiscriminately as support for a strict interpretation of the phrase. This is not borne out by a close reading of the Indiana cases.[19]

In the Alspaugh case, contrary to the Indiana defendant's attempt to bar the action by reason of the foreign corporation's failure to comply with the statute, the court held the statute did not apply to mere solicitation which was there involved.

The Alspaugh case did not turn on the extent to which Indiana would subject a foreign corporation to service of process

---

18. Perhaps one reason the Alspaugh case has been misread in the past is the statement which originally appeared in the Northeastern Reporter at 91 N.E. 506. The text there read, "There is no reason * * *." The official Indiana report read, "There is *a* reason * * *." The quoted paragraph takes on a different meaning when properly quoted.

19. See note 17, supra.

in an action by an Indiana suitor. While the court agrees with the holding in the Alspaugh case, it does not believe it is controlling in the case at bar.

In a case which has never been repudiated or questioned by the Indiana courts, the Indiana Appellate Court, dealing with the specific question before this court—whether a foreign corporation was amenable to service of process, or *in personam* jurisdiction, by reason of its activities within this state—clearly indicated that solicitation of business alone was sufficient activity in this state to cause the Indiana court to exercise *in personam* jurisdiction. In Rush v. Foos Mfg. Co., 20 Ind.App. 515, 51 N.E. 143 (1898),[20] decided long prior to International Shoe and only shortly before the Alspaugh decision, it was held that a foreign corporation was doing business within this state, *even though it had no office* in Indiana. The other facts of the case do not appear from the opinion, and the court there noted that defendant had not denied an allegation that it was "doing business" in Indiana, but the question of "doing business" was thoroughly considered. The following reference in the Rush case to a case decided in the United States District Court of Indiana, together with the Indiana Appellate Court's comment thereon, clearly indicates the feeling of the courts of this state at that time with regard to the extent of activity necessary to constitute "doing business" for purposes of being amenable to process:

"Judge Baker, of the United States court for the district of Indiana, has recently passed upon the question we are now considering in the case of Scofield v. Brewing Co. The case is not reported, but the facts are substantially as follows: Scofield sued the brewing company in the Elkhart circuit court to recover for alleged personal injuries. Summons was served upon one Howe, as the agent of the company, and the return showed that there was no officer of the company superior in rank found upon whom service could be had. The case was moved to the federal court, where a motion was made to quash and set aside the summons and the sheriff's return. The brewing company was a foreign corporation; did not have any office or place of business for the transaction of business in Indiana; that it did not transact business in said state except as it received orders by mail or obtained orders in said state by and through its traveling salesmen, who went from Chicago, Ill., where said company was organized, and had its office; that said company did not and never had any agents residing in this state; that the only agents it ever had in this state were traveling salesmen temporarily going from place to place, whose sole authority was to solicit and procure orders for the products of the said company; that said Howe was such salesman, and that he had his residence in Chicago, and his sole authority was as just stated; that when said summons was served on him he was at Elkhart, Ind., temporarily, for the sole purpose of soliciting and procuring orders of said company. Upon these facts, which were found specially, the court stated its conclusion of law that the service of summons so made on said Howe was sufficient to give the Elkhart circuit court jurisdiction over said company. This is the strongest case we have found, and while, in our judgment, the rule announced is carried to the very border line and extreme limits, it is entitled to much weight, coming as it does from one so profoundly learned in the law, and one who has had such a long experience, both as a lawyer and a judge." Rush v. Foos

---

20. See note 17, supra.

Mfg. Co., supra, 20 Ind.App. at 532, 533, 51 N.E. at 149.

The only case decided by the Indiana courts since the enactment of Section 25–316 involving amenability to service is Travis v. Fuqua, 121 Ind.App. 440, 97 N.E.2d 867 (1950), and it did not involve the statute here in question.[21] There, the defendant individual had an agreement with a local railway company as an accommodation to its passengers whereby the latter sold tickets for travel over defendant's connecting bus routes in Kentucky. The defendant and all his bus routes were situated wholly in Kentucky. Not surprisingly, the Indiana court held that the selling of tickets through the local railway did not constitute doing business in Indiana, even if it were assumed that the local railway was defendant's agent for that purpose. In Fuqua, there was not a solicitation of business as such, but merely the appointment of an "agent" within this state to sell defendant's tickets as an accommodation to the traveler.[22] In the instant case it could not be seriously contended that the mere appointment of the wholesalers to distribute defendant Rheem's products, without more, would constitute the activity required to do business in this state. In addition, in Fuqua, the defendant was an individual, not a foreign corporation. The court noted this fact, and distinguished the International Shoe case on this basis. It also pointed out that the facts in International Shoe were not comparable.

Green v. Chicago, B. & Q. Ry. Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916 (1907), also cited and relied on by the defendant, since it was cited in Esquire, was decided in 1907, long prior to Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). There the Supreme Court was applying general federal law to construe the meaning of the term "doing business" in order to determine whether the defendant was doing business within a federal judicial district in such a sense that it was liable to service of process of a federal circuit court in the district. The court made no reference to constitutional limitations, but rather distinguished the cases cited by the plaintiff solely on the basis that they were brought in state courts and involved a question of a state statute and jurisdiction of the state courts. Since, in the present case, the Erie Doctrine applies, the early general federal law has no application, and it would appear that the question comes within the cases distinguished in the Green case. It follows, the Green case is not very helpful, and lends little, if any, support, either to the holding in Esquire, or the defendant's position here.[23] Although it was stated in Green that "mere solicitation" did not constitute "doing business" for purposes of amenability to suit,[24] it was later recognized in the International Harvester

---

21. The statute involved was Ind.Ann.Stat. § 2–703 (1946), which provides: "When a corporation, company or individual has an office or agency in any county for the transaction of business, any action growing out of, or connected with, the business of such office may be brought in the county where the office or agency is located, at the option of the plaintiff, as though the principal resided therein; and service upon any agent or clerk employed in the office or agency shall be sufficient service upon the principal; or process may be sent to any county and served upon the principal." The statute has been held applicable to foreign corporations. Rauber v. Whitney, 125 Ind. 216, 25 N.E. 186 (1890).

22. See note 16, supra.

23. Compare Lone Star Package Car Co. v. Baltimore & O. R. Co., 212 F.2d 147, 154 (5th Cir. 1954).

24. The Green case, the first Supreme Court decision laying down the rule that "mere solicitation" did not constitute "doing business," has been questioned, by at least four courts of appeal, as to its authoritativeness in light of more recent Supreme Court decisions (particularly International Shoe Co. v. Wash-

case that continuous solicitation *plus other activity* would constitute "doing business." The extent of this "other activity" has not been fixed by the Supreme Court, it being recognized that there is no clear cut rule which can be laid down to fit all cases. Each case must turn on its own facts. This is a cardinal rule.

As to whether solicitation when conducted regularly and consistently may amount to "doing business," the Supreme Court in Nippert v. City of Richmond, 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760 (1946), although dealing with the constitutionality of a local licensing ordinance imposing an annual licensing tax upon persons "engaged in business as solicitors," said,

"In view of the ruling in International Shoe Co. v. Washington, supra, we put aside any suggestion that 'solicitation,' when conducted regularly and continuously within the state, so as to constitute a course of business, may not be 'doing business' just as is the making of delivery, at any rate for the purpose of focusing a tax which in other respects would be sustainable." 327 U.S. at 426, 66 S.Ct. at 591.

Compare also, United States v. Scophony Corp., 333 U.S. 795, 807, 68 S.Ct. 855, 861, 92 L.Ed. 1091 (1948):

"Refinements such as previously were made under the 'mere solicitation' and 'solicitation plus' criteria, cf. Frene v. Louisville Cement Co.,

supra, and like those drawn, e. g., between the People's Tobacco [Co. v. American Tobacco Co., 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587 (1918)] and International Harvester cases, supra, were no longer determinative [of venue]. The practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character' became the test of venue."

In its brief in support of its motion, defendant Rheem states, "we would call the Court's attention to the fact that our Statute states specifically that the question must arise or grow out of a transaction within the State of Indiana by the foreign corporation." In this connection, the pertinent part of the statute, Section 25–316, states that the Secretary of State may be served as the lawful attorney of a foreign corporation which is "engaging in any transaction or the doing of any business in this state," in any action or proceeding against such foreign corporation "arising or growing out of, directly or indirectly, any act or thing done by such corporation within the state of Indiana."

If, by this, the defendant is contending that the words "any act or thing done" do not embrace the wrong here complained of, then the defendant would have the court abandon the long established principle which localizes the tort to the place where the last event necessary to make an actor liable, i. e., the injury, actually occurred. Restatement, Conflicts of Laws § 377 (1934); Slinkard v.

ington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and International Harvester Co. of America v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479 (1914)). See Scholnik v. National Airlines, 219 F.2d 115, 118, 119 (6th Cir.), cert. denied, 349 U.S. 956, 75 S.Ct. 882, 99 L.Ed. 1280 (1955); Lone Star Package Car Co. v. Baltimore & O. R. Co., 212 F.2d 147, 155 (5th Cir. 1954); Jacobowitz v. Thomson, 141 F.2d 72, 75 (2d Cir. 1944); Frene v. Louisville Cement Co., 77 U.S.App.D.C. 129, 134 F.2d 511, 146 A.L.R. 926 (D.C.Cir. 1943),

cited approvingly in International Shoe, 326 U.S. at 314, 66 S.Ct. at 157. Compare Hutchinson v. Chase & Gilbert, 45 F.2d 139, 141 (2d Cir. 1930). The Supreme Court itself has given a number of indications that Green is no longer the law. See St. Louis Southwestern Ry. Co. of Texas v. Alexander, 227 U.S. 218, 33 S.Ct. 245, 57 L.Ed. 486 (1913); International Harvester Co. of America v. Kentucky, supra, 234 U.S. at 586, 34 S.Ct. at 946 (calling Green an "extreme" case).

Babb, 125 Ind.App. 76, 112 N.E.2d 876 (1953), transfer denied, 233 Ind. 633, 122 N.E.2d 463 (1954). See also Orr v. Sasseman, 239 F.2d 182, 186 (5th Cir. 1956); Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633 (2d Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

[13, 14] By this the court does not mean to say, the statute goes so far as to embrace the "single tort" theory of jurisdiction as adopted in other states.[25] Nor does the court here decide that the words "engaging in any transaction" embrace the "single tort" theory. The court does say, however, in the absence of any legislative history to the contrary, the language of the statute must be construed as it is, and, where there is no ambiguity in the words used, the court may not enlarge or restrict the words used therein. See 26 I.L.E. Statutes § 102, p. 309 (1960). Where the language is clear such language must be given a literal interpretation.

The statute provides two requirements: (1) That the foreign corporation be "engaging in any transaction or the doing of any business" in this state, and (2) that the action brought be one "arising or growing out of, directly or indirectly, any act or thing done" within this state. Without the second limitation, the statute would permit an Indiana

suitor to maintain an action against such a foreign corporation even though the cause of action arose entirely outside the state.[26]

From an analysis of the Indiana case law, the statutes, attorneys general opinions,[27] the holding in the Esquire case, and the foregoing analysis of Section 25–316, the court concludes that Indiana has not adopted a narrow interpretation of the term "doing business" as applied to the question of a foreign corporation's amenability to service of process in actions growing out of activities performed by corporate agents within the state. When measured in view of the modern technological advancements in travel and communication, and compared with recent legislation of other states,[28] the Indiana statute, even when narrowly read but given its literal meaning, is broad enough to embrace the circumstances of the case at bar. Here, as in Kaye-Martin v. Brooks, 267 F.2d 394, 397 (7th Cir.), cert. denied, 361 U.S. 832, 80 S.Ct. 84, 4 L.Ed.2d 75 (1959), the language "engaging in any transaction or the doing of any business" in the Indiana statute is as broad as constitutional authority will permit.

The facts in the case at bar differ from the facts in International Shoe.[29] However, the very essence of that case is that the question of whether

---

25. See Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961); Smyth v. Twin State Improvement Corp., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193 (1951); Annot. 78 A.L.R.2d 397, 406 (1961). Cf. Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957).

26. The bill originally so provided. It provided that the suitor might serve process upon such a foreign corporation "in any action or proceeding against such foreign corporation *within this state.*" 1939 Indiana Senate Journal 450. (Emphasis added.) The italicized portion was removed and the restrictive phrase requiring that the action arise or grow out of, directly or indirectly, an act or thing done in Indiana, was added.

27. For a good source of a collection of the citations to these authorities, see 7 I.L.E. Foreign Corporations § 301 (1958); 8 West's Indiana Digest, Foreign Corporations ☞631 (1953).

28. See, e. g., Ill.Rev.Stat., ch. 110, §§ 16, 17 (1955); Md.Ann.Code art. 23, § 88 (d) (1951); N.Y.Ins.Law, McKinney's Consol.Laws c. 28, § 59–a(2) (a); S.C. Code § 37–265 (1952); Tenn.Code Ann. § 56–319(4) (1955); Va.Code Ann. § 13–139 (1950); Vt.State Rev. § 1562 (1947).

29. In the International Shoe case, the defendant manufactured footwear in Missouri and maintained no office in the State of Washington, where it had been served and sued. It employed eleven to thirteen salesmen in Washington under

due process limitations have been met is not answered by determining whether the corporate activity "is a little more or a little less" but rather by determining whether "the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure," is such that "certain minimum contacts" are present so that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 319, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The activities carried on in behalf of defendant Rheem in the State of Indiana were "neither irregular nor casual." They were systematic and continuous throughout the years in question. They resulted in excess of $1,000,000.00 of interstate business annually, in the course of which the defendant Rheem received the benefits and protection of the laws of the state, including the right to resort to the courts for the enforcement of its rights.[30] It is evident that these operations established sufficient contacts or ties with the state of the forum to make it reasonable and just to permit it to be sued in the courts of Indiana. This would not offend "traditional notions of fair play and substantial justice" where, as here, the activities of the defendant's employees, as the findings disclose, in addition to the solicitation of orders, are such as to take them behind the counters, into the stockrooms and packaging departments of its customers, and when requested, pair them with its distributors' salesmen. Nor would this herald the "demise of all restrictions on the personal jurisdiction" over foreign corporations which may be confronted with suits by local suitors in this court. Hanson v. Denckla, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Neither would it appear that defendant Rheem would be greatly inconvenienced to defend the action in the District Court at Terre Haute, Indiana, where the plaintiff and many of her witnesses reside.

Thus, since the facts in the case at bar are such that under state law the defendant Rheem is subject to service of process under the provisions of Section 25–316 of the Indiana statutes, and since that statute, as here construed and applied, does not exceed the constitutional limitations of the due process clause of the fourteenth amendment, under the decisions of the Supreme Court, the motion to dismiss or to quash the return of service of process is Denied.

the control of a sales manager in St. Louis, Missouri. The salesmen were residents of, and lived in, Washington. Their principal activities were confined to Washington. The salesmen showed samples to prospective customers and sometimes rented permanent or temporary sample rooms in buildings or hotels. Their authority was limited to "exhibiting their samples and soliciting orders from prospective buyers, at prices and on terms fixed by appellant." The orders were transmitted to the defendant's Missouri office for acceptance or rejection, and the merchandise was shipped f. o. b. from points outside Washington to purchasers in Washington. All merchandise shipped into Washington was invoiced at the place of shipment, and collections were made from that point. None of the salesmen was authorized to make collections or to enter into contracts. Upon these facts, the Supreme Court of the United States held that the International Shoe Company's contacts with, and activities in, the State of Washington were such that it was "doing business" in the state.

30. See note 4, supra, and text preceding note 18, supra.