SECURITY CREDIT ACCEPTANCE CORP. *v.* STATE OF INDIANA.

[No. 268-A-27. Filed May 27, 1969. Rehearing denied July 15, 1969. Transfer denied October 24, 1969.]

*Donald C. Bowen, Bowen Myers Northam & Givan,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Douglas McFaddin,* Deputy Attorney General, and *John F. Davis,* Deputy Attorney General, for appellee.

SHARP, J.—This action was brought by the Plaintiff-Appellee, State of Indiana, on April 11, 1967. The complaint alleged that Defendant-Appellant, Security Credit Corporation, hereinafter called Security, is an Ohio corporation with its principal place of business in Ohio and that it, through agents in the State of Indiana, actively solicited customers for Security's services in collecting overdue accounts; that this activity constituted doing of business within Indiana and that Security did not possess nor had it been issued any certificate of admission by Indiana authorizing it to transact business in Indiana. The State of Indiana asked that a penalty of Ten Thousand Dollars ($10,000.00) be assessed against the Appellant by reason of said alleged activity and sought to enjoin Security from conducting a collection agency or acting as a collection agency in the State of Indiana.

The State of Indiana propounded interrogatories which Security answered under oath. Security also filed a verified Plea in Abatement.

On August 29, 1967, the State of Indiana filed a Motion for Summary Judgment under Burns' Ind. Stat. Ann., § 2-2524, "on the ground that the pleadings and interrogatories attached hereto show that there is no genuine issue of fact in this case and that the plaintiff is entitled to judgment as a matter of law." The Motion for Summary Judgment was

supported by affidavit and Security filed no affidavits or pleadings in opposition. On January 4, 1968, the trial court entered judgment for the Appellee, State of Indiana, adjudging a penalty of Ten Thousand Dollars ($10,000.00) and enjoined Security from conducting a collection agency in Indiana until it is licensed to do so.

The facts in this case are not in dispute, only the legal conclusions drawn from them. Security is an Ohio corporation with its principal business in Mentor, Ohio; it is engaged in the collection of delinquent accounts for creditors in Indiana and is not licensed as a corporation nor collection agency under Indiana law. Security employs individuals called "brokers" to solicit customers. Security had 45 of these "brokers" soliciting business in its behalf in Indiana in the years 1965, 1966 and 1967. Among the materials which Security supplied its creditor-customers was a cognovit note for signature by the debtor. Such notes were forwarded to Security after being signed by the debtor under the contract between Security and the creditor. Security received a collection fee of 30% on these accounts and payable only upon collection. Security on occasion forwarded an introductory letter on its letterheard to potential customers introducing the "broker" prior to the personal contact by the "broker". During 1965, 1966 and 1967 Security collected $152,608.40 for its Indiana customers and remitted to them $86,148.14 with a total 1407 Indiana customers under contract throughout the State. Each debtor forwarded all monies directly to the office of Security in Ohio and Security remitted the money sometimes as much as a year later.

The agreement between Security and the so-called broker provided:

"1. Broker is authorized to elicit accounts, notes receivable and applications for Company's collection service as set forth in Company's Application-Agreement. Broker agrees to promptly transmit to Company, on client's behalf, for Company's acceptance or rejection, such accounts, notes

and applications as he may have solicited; before submitting such accounts or notes receivable to any other person, firm or corporation.

"2. Company agrees to purchase from Broker and pay promptly, at the rates set forth in Company's Official Price Schedule, printed on the reverse side hereof, for all acceptable accounts and notes submitted by Broker, in accordance with Company's Official Acceptance Terms. Company further agrees to pay the Broker full rates on repeat business until such time as this agreement has been terminated by either party hereto. Broker expressly waives all right to compensation for any accounts, notes or applications not accepted by the Company.

"3. It is mutually understood and agreed between Company and Broker, that Broker's relationship is that of independent contractor, and that Broker is subject to no control or direction by Company as to time, facilities or expense incurred by him in obtaining applications for Company's collection service, and that Broker is free to conduct his business when and if he so desires. Broker is to receive no salary or expense account, and all fees paid Broker on accepted business purchased by Company will not be subject to Withholding or Social Security Taxes.

"4. Broker agrees to make no misrepresentations or incorrect statement of fact to prospective clients, but to truthfully present the Company's collection plan as set forth in the Brokers' Prospectus.

"5. Broker agrees that all supplies including Broker's Prospectus are Company property which is loaned the Broker, and that such supplies and Prospectus will be returned to Company's home office, via Parcel Post upon demand.

"6. This agreement shall remain in full force and effect for one (1) year and continuously thereafter unless terminated as provided herein. Company or Broker may terminate this agreement by giving written notice thereof to the other at such other's last known address. In event of termination by either party or for any cause, Broker relinquishes all rights under this Agreement.

"7. No assignment of this Agreement or the benefits accruing thereunder, in whole or in part, shall be valid or in any way binding upon Company.

"8. It is mutually understood and specifically agreed that the Broker is Not Authorized by this agreement to accept

on behalf of Company any checks, drafts or cash from clients, or from any person whose name may be listed as a debtor by a client."

The trial court also had before it when ruling upon the Appellee's Motion for Summary Judgment an affidavit of Marshall Hughes, which stated:

"1. That he is the administrator of the Collection Agency Division of the Secretary of State's Office of Indiana and makes this affidavit in support of plaintiff's Motion for Summary Judgment.

"2. That on or about January 13, 1967, he received a letter and other documents (attached hereto as Exhibits A, B, C and D) from Arnold Hirsh, Credit Manager of Walters Hospital.

"3. That on or about March 2, 1967, he received a letter and other documents from James A. Hegeman, President of National Rent-A-Cycle, Inc. (copies of which are attached hereto as Exhibits E, F, G and H).

"4. That Security Credit Acceptance Corporation is not licensed as a Collection agency by the Secretary of the State of Indiana."

Attached to said affidavit were certain evidentiary materials which we find it necessary to summarize in order to disclose the nature and extent of Security's activities in Indiana. There was "Instructions to Clients" issued by Security and showing a copy of its corporate seal on the face. The client is instructed to offer no apology for referrring a past due account to Security. Four easy steps are suggested:

(a) Have debtor sign Budget Plan Note [cognovit note].

(b) Set up schedule of payment with debtor.

(c) Inform debtor note may be turned over to Security.

(d) Client sign note and mail to Security. "BE SURE TO SEND THE FULL AMOUNT OF ANY PARTIAL PAYMENT MADE BY DEBTOR, WHEN MAILING BUDGET PLAN NOTE . . . . BE SURE TO FORWARD ALL

BUDGET PLAN NOTES AND APPLICATIONS PROMPT-
LY TO SECURITY CREDIT ACCEPTANCE CORPORA-
TION, SECURITY BUILDING, MENTOR, OHIO."

An example of the application and agreement (creditor's memo copy) provided:

"To: THE SECURITY CREDIT ACCEPTANCE CORP.
Gentlemen: Security Building, Mentor, Ohio DATE——

I hereby make application for your services and deliver to you, The Security Credit Acceptance Corporation, in and at Mentor, Ohio, for your acceptance or rejection, the attached list of legally due and correct accounts containing ————— debtor names for liquidation, subject to your discretion in settlement. Upon your acceptance of this Application, it is mutually understood and agreed that the situs for performance of the ensuing Agreement shall be at Mentor, Ohio. I hereby acknowledge receipt of the necessary printed forms which you have furnished and I understand that I am not obligated to you except under the following terms and conditions:

You agree to initiate a preliminary fifteen (15) day audit of the above referred to and attached list of accounts on the date of acceptance and acknowledgment of said accounts by you to me. On that date, you agree to notify each debtor via first class mail that he be required to arrange settlement of his account with me within fifteen (15) days from the date of said notification.

I agree to forward you for collection all Budget Plan Note forms received from any and all debtors arranging settlement of their obligations with me during the preliminary audit period and you shall have the option to discount any of said Notes without recourse to me. This does not require you to discount any account or Notes and this discount option may be exercised only on those accounts evidenced by a Budget Plan Note.

You agree to immediately remit to me the sum of Seventy Per Cent (70%) of the face value of any account subject to and approved by you for discount.

You agree to continue your efforts to secure payment of any undiscounted accounts. In consideration of the time and expense thus incurred by you, I agree to allow you

and/or you to retain as your compensation the following charges:

Thirty per cent (30%) of the amount of each account submitted by me and accepted for liquidation. This charge to apply only on accounts where payment, full or partial, has been received. A minimum of Three Dollars ($3.00) will be charged on every account. Accounts amounting to less than Five Dollars ($5.00) are not acceptable.

ALL MONIES DUE ME TO BE REMITTED IMMEDIATELY.

I agree to report to you immediately all payments, full or partial, received from debtors and I specifically agree to remit to you THIRTY PER CENT (30%) of the amount received by me, said amount to appear as a credit to my account in your accountings to me.

I further agree to promptly furnish you with itemized statements of any disputed accounts, and you are hereby granted full power and authority to perform all acts necessary to liquidate, to collect, and to obtain payment of these accounts, to endorse and reduce to cash any instrument payable to me, or you, pertaining to settlement of these accounts.

You agree that all accounts upon which no payment has been realized shall be promptly returned, upon written request, at the expiration of 180 days from the date hereof.

Full charges are due and payable to you, the day payments or settlements are made and/or in the event any accounts are cancelled or withdrawn during process of liquidation.

I have read and understand the foregoing agreement and recognize this as the only agreement between us, which cannot be altered or cancelled except by mutual consent of an officer of The Security Credit Acceptance Corporation and myself.

Business ................    Firm Name ................
Address ................     Signature X ......Title....
Broker .................     Accepted .................
        The Security Credit Acceptance Corp............
                                              Officer

Please advise all debtors to arrange settlement directly with you and process any accounts submitted in accordance with the collection provisions of above Application-Agreement.

Signature X ............Title............"

Under date of January 10, 1967, on the letterhead of Security a letter was mailed to Walters Hospital, Inc., Michigan City, Indiana, by a Mr. R. J. Wells, Manager, Medical Service Division, of Security, which stated:

"Dear Doctor:

In the next few days, the Broker of Medical accounts in your area, Mr. Don Curry will be calling you to present 'The Security Plan.'

Members of the Medical Profession have many and varied problems. The most important, of course, is the continued and effective liquidation of accounts receivable. This requires a definite program formulated to secure the maximum cash recovery from delinquent accounts. We are Specialists in this field and we have prepared this special portfolio for you to illustrate how 'The Security Plan' can assist you in converting your delinquent accounts into cash.

It is sad but true that statistics gathered over a period of many years clearly show that the Medical Profession is prone to accumulate more delinquent accounts than any other business or profession. We have found that the reason for this is two-fold: (1) human nature being what it is, most people's first concern is the payment of what they regard as the basic necessities such as food, clothing, shelter, etc., and forget the vital service which you offered them during a period of illness; and (2) the failure of some members of the Medical Profession to realize the vital importance of keeping their unpaid accounts at a minimum by utilizing a proven liquidation service capable of producing maximum cash recovery.

Realizing the above, we feel certain that you will be vitally interested in 'The Security Plan'. In addition to effecting the liquidation of the accounts that are now being carried as delinquent on your books, this Plan will provide you with the means to prevent the recurrence of such delinquencies in the future.

We believe that you will agree with us that there are but two salient points to be considered in your desire to convert your accounts into cash. These two points are as follows:

Point One—That the organization you employ to accomplish this job for you be capable and have a clear and concise understanding of your problem and know how to contend with it.

Point Two—That since you are an integral part of the community essential good will must be retained wherever possible.

In accordance with our policy, and in line with the dictates of good business, let's talk frankly and cover the two points in question.

Point One—The information furnished you in this portfolio clearly indicates the psychological approach and follow-through that play a dominant part in our handling of the individual debtor. We fully realize our responsibility to you while, at the same time, we realize the importance of maintaining the good will of the debtor.

Point Two—One of the primary objectives of our service is not only to retain existing good will but to actually create it whenever possible. It has been our experience that the honest debtor is troubled by his delinquency and actually feels relieved at the opportunity to take care of it on a small payment basis with no interest or carrying charges to everyone's satisfaction.

We feel certain that you are concerned with the fact that all debtors who are honest and want to do the right thing are given the opportunity to do so. In connection with this, we wish to advise you that our Medical Service Division consists of a group of highly trained Executives to whom we refer as Individual Credit Counselors. The function of these people is just as the title implies—the handling of accounts on an individual basis and the careful working out of a payment plan with each debtor that is tailored to his individual income and responsibilities. The effectiveness of this is illustrated on the opposite page.

Mr. Curry will be pleased to answer any further questions you may have regarding our service. We feel certain you will find him to be very capable and anxious to help you in every way possible.

Trusting that we may be of financial service to you, we remain"

On January 13, 1967, Mr. Arnold Hirsh, Credit Manager of said Walters Hospital, Inc., directed a letter to the Indiana Secretary of State, which stated:

"On Wednesday, January 11 and again today we were solicited by a Mr. Don Curry who represents himself as a broker for Security Credit Acceptance Corporation of Mentor, Ohio. This Corporation is in the collection business and promises extraordinary effort and results at rates much lower than our local collection agencies.

We were advised that Security Credit Acceptance Corporation is licensed and bonded to do business in the State of Indiana.

For your information we enclose herewith a copy of their agreement form and brochure which are self explanatory. We would appreciate your returning these papers to us at your convenience.

We do not intend to take advantage of the services offered by Security Credit Acceptance Corporation."

The affidavit of James A. Hegeman, President, National Rent-A-Cycle, Inc., Indianapolis, dated March 2, 1967, stated:

"To whom it may concern:

This is a statement of National Rent-A-Cycle, Inc.'s or Variable Enterprises, Inc.'s dealings with The Security Credit Acceptance Corporation, Mentor Building, Mentor, Ohio. Our corporate name is Variable Enterprises, Inc. and we do business under the assumed name of National Rent-A-Cycle, Inc.

On June 2, 1966, a Mr. Wade H. Holt called on us at 1014 N. Emerson Ave., Indianapolis, representing himself as a broker for the Security Credit Acceptance Corporation (hereinafter referred to as SAC). He said that SAC would, upon acceptance of a bad account from us, remit 70% of the money owed to us. We discovered later, however, that according to the contract, that SAC would only remit when a signed note by the debtor was received by them. I signed the contract and received a copy and a brochure from Mr. Holt (Exhibit A) and listed the following accounts with him at that time:

James Knight, 1925 N. Central, Indpls., $12.75
Clarence Beckwith, 2614 Baltimore, Indpls., $80.25
Steve Hardin, 3720 N. Penn., Indpls., $10.00
Howard Yosha, 5853 Broadway, Indpls., $118.81
Ernest R. Montgomery, 3018 N. Graceland, Indpls., $80.00
Raymond Musgrove, 529 E. 60th St., Indpls., $21.00
Danny Parsons, 2538 N. Delaware, Indpls., $22.00
Alonzo McCoy, 3001 N. Delaware, Indpls., $15.00
Ronnie Reynolds, 5135 W. 10th St., Indpls., $5.00
David M. Buster, 1609 N. Delaware, Indpls., $45.34
Jerry Smith, 2618 Brookside, Indpls., $13.24
Jesse Woods, 3135 Perkins, Indpls., $34.42
Dennis Szwech, 115 Magaw Ave., Babylon, N.Y., $30.00

On July 16, 1967, we submitted the following accounts to SAC for collection:

\* Robert Anderson, 309 E. 24th St., Indpls., $6.51
\* Scotty Cox, 3740 Orchard, Indpls., $3.94
  Donald L. Williams, 2823 Sutherland, Indpls., $3.86
  John T. Carter, 1744 Yandes, Indpls., $9.95

On August 15, 1966, we submitted the following accounts to SAC for collection:

\* Robert Carlton, 716 N. Denny, Indpls., $41.85
\* Mark Harrison, 2914 Ruckle, Indpls., $13.46
\* Charles L. Lewis, 207 S. Grant, Indpls., $25.84
  Charles Miles, 1853 Tallman, Indpls., $2,190.30

On November 28, 1966, we submitted the following accounts to SAC for collection:

Ellen Flenner, 600 E. Main St., Franklin, Ind., $349.34
Ronald Shrum, 27 S. Highland, Indpls., $8.10
Margaret Wilson, 1326 Marlowe, Indpls., $88.22
Bradley Loman, 1117 W. Troy, Indpls., $20.00
David Sprague, 1606 Brookside Ave., Indpls., $25.94
Billy W. Keen, 2917 E. 18th St., Indpls., $22.11
Gerald Patterson, 1814 Olive, Indpls., $72.85
Mrs. Gaye, 2439 Broadway, Indpls., $14.60
Thomas L. Smith, 3325 N. Central, Indpls., $8.86
Gary Hard, 6535 Homstead Dr., Indpls., $8.86
Thomas Oaks II, 2503 Endsley Dr., $11.83
Jimmy Land, 3217 E. North, Indpls., $8.99

The items marked with an asterisk were submitted with a signed SAC promissory note as mentioned in the original agreement; however, to this date, we have not received payment of any kind from SAC.

We wrote to SAC in October, 1966, asking about the status of our accounts. They replied asking that we give them another 30 days to review their files. When they did not reply in 30 days, we called them in the middle of December, 1966. SAC promised at that time to issue a full account to us. We received SAC's 12-22-66 letter saying to send them a list of the payments we have received at which time they could audit our file (see Exhibit B for copy of 12-22-66 letter to M. H. Neave). Since we only received one payment from a debtor, it was not difficult to submit a full accounting to SAC. Since replying to this request, we have had no word from SAC.

Exhibit C shows two of the acknowledgements received from SAC.

To summarize, Security Credit Acceptance Corporation fraudulently solicited and obtained our bad accounts for collection, collected or attempted to collect these accounts, and failed to remit any portion of the accounts to us. When attempting to remedy this with Security Acceptance, they have stalled us on several occasions."

The record in this case involves the legal concept of "doing business" from three different legal approaches.

First, Security transacted sufficient business in Indiana and had sufficient contacts with Indiana to give an Indiana Court in personam jurisdiction. Security in its answer in abatement takes the position there were insufficient contacts with Indiana under our long arm statute, Burns' Ind. Stat. Ann., § 25-316, which in part reads:

"The engaging in any transaction or the doing of any business in this state by any foreign corporation not licensed nor admitted to do business in this state under any existing act or any act hereafter enacted shall be deemed equivalent to an appointment by such foreign corporation of the secretary of state, or his successor in office, to be the true and lawful attorney and agent of such foreign corporation upon whom may be served all lawful processes,

writs, notices, or orders in any action or proceeding against such foreign corporation arising or growing out of, directly or indirectly, any act or thing done by such corporation within the state of Indiana. The engaging in any transaction or the doing of any business in this state by any foreign corporation not licensed nor admitted to do business in this state under any existing act or any act hereafter enacted shall be significant of the agreement of such foreign corporation that any such process, writ, notice, or order against it, which is so served, shall be of the same legal force and effect as if served upon a designated resident agent of such foreign corporation."

The answers to interrogatories affirmatively demonstrate Security had solicitors acting on its behalf in this State. There is also evidence manifesting a pattern of direct contacts with the Indiana customers. The pattern of conduct by Security certainly amounts to more than mere solicitation.

The basic standard for in personam jurisdiction was ably set forth by Chief Justice Stone in *International Shoe Co. v. Washington,* 326 U. S. 310 (1945). In 326 U. S. at page 320, it was stated as follows:

"Applying these standards, the activities carried on in behalf of appellant in the State of Washington were neither irregular nor casual. They were systematic and continuous through the years in question. They resulted in a large volume of interstate business, in the course of which appellant received the benefits and protection of the laws of the state, including the right to resort to the courts for the enforcements of its rights. The obligation which is here sued upon arose out of those very activities. It is evident that these operations establish sufficient contacts or ties with the state of the forum to make it reasonable and just, according to our traditional conception of fair play and substantial justice, to permit the state to enforce the obligations which appellant has incurred there. Hence we cannot say that the maintenance of the present suit in the State of Washington involves an unreasonable or undue procedure."

Upon the foundation of *International Shoe Co., supra,* the Supreme Court of the United States had broadened the concept of the constitutionally permissible basis for in ▪ personam jurisdiction over foreign corporations. In *McGee v. International Life Insurance Co.,* 355 U. S. 220 (1957), a resident of California purchased a life insurance policy from an Arizona corporation. Thereafter, a Texas corporation assumed the life insurance obligations of the Arizona corporation and mailed a reinsurance certificate to him in California. The insured paid the premiums by mail from his California home. Neither corporation ever had persons soliciting business on their behalf in California. The Supreme Court held that the Texas corporation by so using the mail had made sufficient contact with California to give courts of the state in personam jurisdiction within the meaning and requirements of due process. The Supreme Court of the United States stated:

"Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other non-residents. In fact this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve practice separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." 355 U.S. 222-223.

We therefore hold that under the language of Burns' Ind. Stat. Ann., § 25-316, "*any* transaction or doing of any business in this state", (our emphasis), Security trans- ▪ acted sufficient business in Indiana as to constitute more than enough minimal contacts to give Indiana Courts in personam jurisdiction by substituted service.

Burns' Ind. Stat. Ann., § 25-314, in part states:

"No foreign corporation transacting business in this state without procuring a certificate of admission or, if such a certificate has been procured, after its certificate of admission has been withdrawn or revoked, shall maintain any suit, action or proceeding in any of the courts of this state upon any demand, whether arising out of contract or tort; and every such corporation so transacting business shall be liable by reason thereof to a penalty of not exceeding ten thousand dollars ($10,000.00), to be recovered in any court of competent jurisdiction in an action to be begun and prosecuted by the attorney-general in any county in which such business was transacted."

■   Under this statute Indiana has the power to require corporations to first obtain authorization here before engaging in business ventures in Indiana.

In this regard we hold that Security, a foreign corporation, engaged in a business systematically directed at customers within the state of Indiana and subjected itself to the above requirements of the general corporation act.

■   Security transacted sufficient business in Indiana to involve the power to regulate it under the state collection agency statute, Burns' Ind. Stat. Ann., § 42-1807, which states:

"(1) It is unlawful for any person to conduct, within this state, a collection agency without first having applied for and obtained a license under the provisions of this act.

"(2) It is unlawful for any person conducting a collection agency within this state to fail to render an account of and pay to the client, for whom collection had been made, the proceeds of such collection, less the charges for collection in accordance with the terms of agreement between the applicant and client. This account shall be made within sixty (60) days from the date of the collection of any claim.

"(3) It is unlawful for any person conducting a collection agency, within this state, to fail to deposit with a local depository note less than one (1) time each week all money due and owing to clients collected by said person, and keep the same on deposit in such depository in a special account

until remitted to the clients. It shall be unlawful for any person to fail to keep a record of the money collected and the remittance thereof.

"(4) It is unlawful for any person operating a collection agency except a nonresident collection agency, in this state to fail to maintain at least one (1) office, as defined by the terms of this act."

Security has operated a collection agency in Indiana. It has engaged in the systematic solicitation of customers in Indiana through agents, whether called "brokers" or "independent contractors." Security cannot change the essential nature of its operation merely by labeling its representatives as "brokers." The facts of this systematic method of operation can hardly be called an "isolated transaction." In fact, it is very clear that Security has engaged in activities which a licensed Indiana collection agency could not do. Security has failed to account and remit the sums collected within 60 days under § 42-1807 (2) and in some instances has failed to do so within one year. This conduct by Security is manifestly contrary to the clear legislative intent in the collection agency act, *supra*. Additionally, Security provides a cognovit note which is subject to fine and punishment under Burns' Ind. Stat. Ann., § 2-2906. An Indiana collection agency could not use this cognovit note, while it is a key part of the sales package offered by Security, an Ohio collection agency. The regulation of such practices was clearly intended by the Indiana General Assembly when it enacted the collection agency act. See 1966 Op. Atty Gen., No. 26, p. 186.

The Appellee cites and relies upon *Green v. Chicago B. & Q. Ry. Co.*, 205 U. S. 530 (1907), and *Philadelphia & Reading R.R. v. McKibbin*, 243 U. S. 264 (1917). Since these two cited cases, the Supreme Court of the United States has spoken on this subject in *International Shoe Co.*, *supra*, *McKee*, *supra*, and most recently in *Eli Lilly & Co. v. Sav-on-Drugs*, 366 U. S. 276 (1961), and *Hanson v. Denckla*, 357 U. S. 235 (1958). These latter four

cases indicate a clear trend away from the *Green* and *Phila-delphia* cases. In fact, Judge Steckler makes this precise point in *Green v. Robertshaw-Fulton Controls Co.*, 204 F. Supp. 117 (S. D. Ind. 1962) also cited by Appellee. While *Green v. Robertshaw, supra,* is not a binding precedent on this court it is an excellent comprehensive opinion which is directly on point in this instant case. We believe it correctly states the law of Indiana. See also, *Electronic Manufacturing Corporation v. Trion, Inc.*, 205 F. Supp. 842 (S. D. Ind. 1962), and *Kokomo Opalescent Glass Co. v. Arthur W. Schmid Inter., Inc.,* 371 F. 2d 208 (7th Cir. 1966).

There was no genuine issue of fact so that the trial court could properly enter summary judgment. See *Markwell v. General Tire and Rubber Co.*, 142 Ind. App. 188, 233 N. E. 2d 676 (1968), and our Supreme Court in *Kapusta v. Depuy Manufacturing Co.*, 249 Ind. 679, 234 N. E. 2d 487 (1968), *Pan American World Airways v. Local Readers Service*, 143 Ind. App. 370, 240 N. E. 2d 552 (1968).

This case is clearly within the principles of *Markwell, supra,* and *Kapusta, supra.* There is no genuine issue of a material fact. The facts, undisputed, lead only to the conclusion which the trial court reached in granting summary judgment.

The Appellant argues further that the lower court erred in sustaining the motion for summary judgment because such a motion is not a proper vehicle for the imposition of a penalty, the amount of which is determined in the court's discretion. The Appellant contends that because Burns' Ind. Stat. Ann., § 25-314 provides for a maximum penalty of $10,000.00, the clear inference of legislative intent is that the court should have exercised its discretion based upon evidentiary facts. We do not find error merely in the imposition of a penalty in the granting of a motion for summary judgment. The penalty here involved

was one of a civil nature. Federal courts have established that the summary judgment proceding may be proper even though the imposition of a civil penalty is involved. See *United States v. Stangland*, 242 F. 2d 843 (7th Cir. 1957); *Miller v. United States*, 242 F. 2d 392 (6th Cir. 1957). The statute involved, Burns' Ind. Stat. Ann., § 25-314 provides that a corporation engaging in business without a certificate shall be liable to a penalty not to exceed $10,000.00. The determination of the amount of this penalty is within the discretion of the trial court and, having found summary judgment proper, this court could only reverse the lower court if a showing of abuse of its discretion was made. Appellant does not provide us with authority nor evidence to demonstrate an abuse of discretion, neither do we find any.

The judgment of the trial court is affirmed. Costs v. Appellants.

Pfaff, C.J., Lowdermilk, P.J., and Hoffman, J., concur.

White, J., not participating.

NOTE—Reported in 247 N.E. 2d 825.