**GRIESE–TRAYLOR CORPORATION, Defendant-Appellant,**

v.

**Floyd N. LEMMONS and Margaret J. Lemmons, Plaintiffs-Appellees.**

**No. 1–979A241.**

Court of Appeals of Indiana, First District.

Aug. 11, 1981.

Rehearing Denied Sept. 15, 1981.

A. Thomas Cobb, Kightlinger, Young, Gray & De Trude, Indianapolis, for defendant-appellant.

Michael K. Phillips, S. Anthony Long, Phillips & Long, Boonville, for plaintiffs-appellees.

## STATEMENT OF THE CASE

NEAL, Presiding Judge.

Defendant Griese-Traylor Corporation (Griese-Traylor) appeals the judgment of the Gibson Circuit Court awarding plaintiffs Floyd and Margaret Lemmons $227,059.88 in damages for breach of contract.

## STATEMENT OF THE FACTS

On August 23, 1974, in Evansville, Indiana, Griese-Traylor entered into a contract to purchase the entire capital stock of Lemmons and Company, Inc. (Lemmons and Company) from Floyd and Margaret Lemmons, the president and secretary of the company.[1]

1. President Robert A. Griese and Floyd and Margaret Lemmons signed on behalf of the corporations; Ferris Traylor, the secretary of Griese-Traylor, signed in attestation.

Paragraphs 1.01 and 1.02 of the contract provided:

"Upon the terms and conditions herein setforth, at the closing 'Seller' shall deliver to 'Purchaser' certificates representing Nine Hundred Fifty (950) shares of 'Seller's' Capital Stock of Lemmons and Company, Inc., (hereinafter referred to as the Company) duly endorsed in blank by the 'Seller'. 'Seller' represents that Five Hundred (500) shares of Capital Stock are owned by FLOYD N. LEMMONS and Four Hundred Fifty (450) shares of Capital Stock are owned by MARGARET J. LEMMONS.

Concurrently with the delivery of the Capital Stock as provided above, 'Purchaser' shall pay to 'Seller' the sum of Four Hundred Fifty Thousand Dollars ($450,000.00), of which sum Two Hundred Thirty-seven Thousand Dollars ($237,000.00) shall be paid to FLOYD N. LEMMONS and Two Hundred Thirteen Thousand Dollars ($213,000.00) shall be paid to MARGARET J. LEMMONS.

As further consideration for the sale of the Capital Stock by 'Seller', FLOYD N. LEMMONS, 'Purchaser' agrees to pay the sum of Three Hundred Dollars ($300.00) each week commencing one week after the closing date of this agreement for fifteen (15) years to 'Seller' FLOYD N. LEMMONS. In the event that the 'Seller' FLOYD N. LEMMONS shall fail to survive, the balance of payments due during the fifteen (15) year period shall then be paid to his surviving spouse and in the event that he is not survived by his spouse, then to the Estate of Floyd N. Lemmons. The 'Purchaser' agrees to adjust the weekly payments of Three Hundred Dollars ($300.00) upward in amounts equal to the increase in the cost of living as measured by the Federal Department of Labor for the preceding twelve (12) months on the anniversary date of the closing of this agreement for each of the fifteen (15) years."

The closing took place on October 24, 1974, in Boonville, Indiana, at the offices of Lemmons and Company. Floyd and Margaret endorsed the certificates in blank and tendered them to Ferris Traylor, and received two checks drawn upon the personal account of Ferris and Mary Traylor in the respective amounts of $227,000 and $213,000.[2]

Although he had officially resigned the presidency, Floyd continued to render services to the company in the capacity of chief operating officer through December of that year. Another man then assumed responsibility for the operation; Floyd continued to render services as a consultant. This arrangement continued, with Floyd rendering fewer and fewer services, until August 3, 1976, at which time the Lemmonses moved to Florida.

Throughout this time Floyd received $300 per week in the form of Lemmons and Company payroll checks. Appropriate state and federal deductions were taken; he paid taxes on his receipts as regular income. He received three cost-of-living increases pursuant to the contract; thus, payments received in the latter part of 1976 were in excess of $339.

Following his retirement to Florida in August, Floyd continued to receive the weekly payments until December 21, 1976, at which time the payments ceased. Lemmons and Company declared bankruptcy that same month.

Early on in January Floyd spoke with Ferris Traylor and informed him the payments had stopped; by letter dated January 14, 1977, Floyd again brought the situation to his attention. Finally, on March 2, 1977, Floyd's attorney notified Robert Griese and Ferris Traylor that Griese-Traylor had breached its contract and that a failure to rectify the situation would result in a lawsuit. The complaint was filed May 20, 1977, requesting damages in the amount of $227,059.88, that being the sum of 668 payments at $339.91. The court found for the Lemmonses and awarded damages in the amount claimed.

---

2. Property Developers Incorporated, a business operated by Ferris Traylor, had deposited $10,000 earnest money in Floyd and Margaret's personal account during the interim.

### ISSUES

Griese-Traylor raises the following issues:

I. Whether the trial court erred in exercising jurisdiction over the non-resident defendant;

II. Whether the trial court erred in finding that the payments were made to Floyd Lemmons as further consideration for the sale of capital stock;

III. Whether the trial court erred in excluding evidence of statements made prior to the signing of the contract pertaining to employment; and

IV. Whether the trial court erred in awarding excessive damages.

*Issue I.*

Griese-Traylor asserts that the trial court lacked personal jurisdiction. Griese-Traylor emphasizes that it is incorporated and maintains its principal place of business and a resident agent in the state of Florida. The corporation shows that it has no business establishment, neither hires nor retains employees, solicits no business, and is not qualified to do business in the state of Indiana. Thus Griese-Traylor argues that the "minimum contacts" requirement of *International Shoe Co. v. Washington*, (1945) 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, has not been met. Furthermore, admitting only a single transaction, i. e. the execution of the contract for the sale and purchase of capital stock, Griese-Traylor argues that it was and is not "doing business" in Indiana within the meaning of Ind. Rules of Procedure, Trial Rule 4.4(A)(1).

It is settled law that the due process clause of the fourteenth amendment limits the power of a state court to render a valid personal judgment against a non-resident defendant. *World-Wide Volkswagen Corp.*

*v. Woodson*, (1980) 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490. Due process requires the following: (1) The defendant must be properly subject to the personal jurisdiction of the court, *International Shoe Co., supra*; (2) The defendant must receive adequate notice of the suit, *Mullane v. Central Hanover Bank & Trust Co.*, (1950) 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865. In the case at bar we are concerned only with the former.

Most recently, in *World-Wide Volkswagen Corp., supra*, the Supreme Court commented:

"The concept of minimum contacts . . . can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

The protection against inconvenient litigation is typically described in terms of 'reasonableness' or 'fairness.' We have said that the defendant's contacts with the forum State must be such that maintenance of the suit 'does not offend "traditional notions of fair play and substantial justice."' . . . The relationship between the defendant and the forum must be such that is 'reasonable . . . to require the corporation to defend the particular suit which is brought there.'" (Citations omitted.)

444 U.S. at 291–292, 100 S.Ct. at 564.[3] The Supreme Court further noted that although the due process limitations placed upon state court jurisdiction to protect against inconvenient litigation have been relaxed in response to progress in communication and

---

**3.** Regarding the issue of inconvenient litigation, the Supreme Court also stated:

"Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute . . .; the plaintiff's interest in obtaining convenient and effective relief . . . at least

when that interest is not adequately protected by the plaintiff's power to choose the forum . . .; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies. . . ." (Citations omitted.)

444 U.S. at 292, 100 S.Ct. at 564. *See* Ind. Rules of Procedure, Trial Rule 4.4(C).

transportation and the resulting economic interdependence of the states, *McGee v. International Life Insurance Co.*, (1957) 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; *Hanson v. Denckla*, (1958) 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, "we have never accepted the proposition that state lines are irrelevant for jurisdiction purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution." 444 U.S. at 293, 100 S.Ct. at 565.

Having briefly noted the constitutional dimensions of the issue, it becomes necessary to consider the Indiana "statute" to be applied in the determination of whether a state court may properly assert personal jurisdiction over a nonresident defendant.

Indiana Rules of Procedure, Trial Rule 4.4 became effective January 1, 1971. It provides in pertinent part:

> "(A) Acts serving as a basis for jurisdiction. Any person or organization that is a nonresident of this state, a resident of this state who has left the state, or a person whose residence is unknown, submits to the jurisdiction of the courts of this state as to any action arising from the following acts committed by him or his agent:
>
> (1) doing any business in this state...."

The parties concede that personal jurisdiction in this case cannot be premised upon T.R. 4.4(A)(2)–(7). Griese-Traylor asserts that jurisdiction cannot be based upon subsection (1), arguing its actions did not constitute "doing business" in this state.

As originally submitted to the legislature, the rule provided:

> "4.4 (a) Acts within this state serving as a basis for jurisdiction.
>
> 4.4 (a) (1) transacting any business in this state;"

1 W. Harvey, Indiana Practice at 298 (1969). The Civil Code Study Commission Comments upon this subsection read, in part, as follows:

> "The words to transact 'any business in this state' would seem to be more inclusive than 'doing business.' See *Haas v.*

*Fancher Furn. Co.*, N.D.Ill.1957, 156 F.Supp. 564. But this would probably change little in Indiana, because the Indiana courts have construed the phrase 'doing business' liberally."

Civil Code Study Commission Comments, 1 W. Harvey, Indiana Practice at 300 (1969). In the state legislature, the word "transacting" was replaced with the word "doing." According to Dean Harvey, the General Assembly amended this subsection simply because it believed that the word "doing" would be more familiar to Indiana courts and attorneys. Nevertheless, the mere combination of the "doing" of "doing business" and of the more inclusive phrase "any business in this state" makes the construction of the rule somewhat problematic.

Fortunately, distinctions among the phrases "doing business," "doing any business," and "transacting any business," as they relate to the issue of long-arm jurisdiction over foreign corporations have been previously drawn by the federal courts applying Indiana law in cases where personal jurisdiction over foreign corporations has been based upon service of process upon the secretary of state pursuant to Ind. Code 23–3–3–1 (Supp.1980).

Ind. Code 23–3–3–1 provides:

> "*The engaging in any transaction or the doing of any business in this state* by any foreign corporation not licensed nor admitted to do business in this state under any existing act or any act hereafter enacted shall be deemed equivalent to an appointment by such foreign corporation of the secretary of state, or his successor in office, to be the true and lawful attorney and agent of such foreign corporation upon whom may be served all lawful processes, writs, notices, or orders in any action or proceeding against such foreign corporation arising or growing out of, directly or indirectly, any act or thing done by such corporation within the state of Indiana." (Emphasis added.)

The statute establishes two requirements for the proper assertion of personal jurisdiction over the defendant: (1) The foreign

corporation must be "engaged in any transaction or the doing of any business" in this state; (2) The cause of action must be one "arising or growing out of, directly or indirectly, any act or thing done" within this state.

In *Green v. Robertshaw-Fulton Controls Company*, (S.D.Ind.1962) 204 F.Supp. 117, an action for personal injuries suffered as a result of defendant's negligence in the manufacture of a hot water heater and gas control assembly unit, the defendant moved to dismiss for lack of jurisdiction. The defendant did not question the adequacy of the notice; rather, it argued that the mere solicitation of orders for the sale of its products did not constitute "doing business" in this state, as traditionally conceived. Inferentially, defendant argued that to apply the statute so as to allow the exercise of personal jurisdiction over it would constitute a violation of due process. *International Shoe Co., supra.*

Judge Steckler began his review and analysis of Indiana case law with the following reminder:

"[I]t is necessary to keep in mind the distinction between the classes of cases determining on the one hand the nature and extent of the activities of a foreign corporation in a state to subject it to service of process therein on the ground that it is 'doing business' there, and the rules applied in construing the terms 'doing business' and 'transacting business' in qualifying statutes, and licensing and tax laws."

204 F.Supp. at 126–127.

Following his analysis of Indiana cases dealing with the application of the penalty features of Indiana's corporate qualification and licensing statutes, *Mutual Manufacturing Company v. Alpaugh*, (1910) 174 Ind. 381, 91 N.E. 504, *reh. denied* 92 N.E. 113; *Peter & Burghard Stone Company v. Carper*, (1930) 96 Ind.App. 554, 172 N.E. 319; *North Dakota Realty and Investment Company v. Abel*, (1927) 85 Ind.App. 563, 155 N.E. 46; *Lowenmeyer v. National Lumber Company*, (1919) 71 Ind.App. 458, 125 N.E. 67, and those cases dealing with the nature

and extent of corporate activity necessary to permit the taxation of receipts from this state, *Gross Income Tax Division v. Surface Combustion Corporation*, (1953) 232 Ind. 100, 111 N.E.2d 50, *cert. denied* 346 U.S. 829, 74 S.Ct. 51, 52, 98 L.Ed. 353, 354; *Gross Income Tax Division v. Fort Pitt Bridge Works*, (1949) 227 Ind. 538, 86 N.E.2d 685, 87 N.E.2d 721, Judge Steckler noted:

"When determining whether the Indiana courts should be closed to foreign corporations for failure to comply with the qualification statutes, and when determining whether the revenue derived from Indiana may be taxed by this state, the courts are dealing primarily with the restrictions of the commerce clause of the Constitution. When determining whether to subject the foreign corporation to service of process in Indiana, the due process clause is primarily involved. In the former, it is the interstate nature of the transactions which prevents a state from regulating and burdening them, . . . whereas purely interstate transactions may give a foreign corporation sufficient 'minimum contacts' with a state so as to permit a state to subject it to service of process. . . . Subjecting a foreign corporation to service of process is not a burden on interstate commerce. . . .

When the Indiana courts, in cases such as *Mutual Mfg. Co. v. Alspaugh* [sic], supra, found that a foreign corporation was not 'doing business' in Indiana, it should be remembered that they were there dealing with the penalty features of this state's qualification statutes. . . . It is well established that penalty statutes are to be strictly construed in favor of those sought to be penalized."

204 F.Supp. at 131–132.

Judge Steckler further analyzed earlier case law dealing with the nature and extent of corporate activity necessary to the assertion of in personam jurisdiction, *United States Health and Accident Insurance Company v. Batt*, (1912) 49 Ind.App. 277, 97 N.E. 195, *Edwards v. Van Cleave*, (1911) 47 Ind.App. 347, 94 N.E. 596, *Rush v. Foos Manufacturing Company*, (1898) 20 Ind. App. 515, 51 N.E. 143, and commented:

"In this jurisdiction the interpretation of the phrase 'doing business' in the penalty statute in the *Alspaugh* [sic] case is cited repeatedly in cases involving a foreign corporation's amenability to service in an action *in personam. It is cited indiscriminately as support for a strict interpretation of the phrase. This is not borne out by a close reading of the Indiana cases.*" (Footnote omitted, emphasis added.)

204 F.Supp. at 113. Finally, he stated:

"*[T]he court concludes that Indiana has not adopted a narrow interpretation of the term 'doing business' as applied to the question of a foreign corporations' amenability to service of process in actions growing out of activities performed by corporate agents within the state.* When measured in view of the modern technological advancements in travel and communication, and compared with recent legislation of other states, the Indiana statute, even when narrowly read but given its literal meaning, is broad enough to embrace the circumstances of the case at bar. Here, as in *Kaye-Martin v. Brooks,* 267 F.2d 394, 397 (7th Cir.), cert. denied, 361 U.S. 832, 80 S.Ct. 84, 4 L.Ed.2d 75 (1959), *the language 'engaging in any transaction or the doing of any business' in the Indiana statute is as broad as constitutional authority will permit.*" (Footnote omitted, emphasis added.)

*Green v. Robertshaw-Fulton Controls, Co.,* 29 F.R.D. 490, at 510. Given the facts of the case before him, he held that the defendant corporation's act of solicitation was sufficient to bring it within the scope of Ind. Code 23–3–3–1, and that the statute, so construed and applied, was not violative of due process. *See Security Credit Acceptance Corporation v. State,* (1969) 144 Ind. App. 558, 247 N.E.2d 825.

Returning to T.R. 4.4(A)(1), we note the Civil Code Study Commission Comments provided:

"The adoption of this rule will expand the in personam jurisdiction of the courts of this state to the limits permitted under the Due Process Clause of the Fourteenth Amendment."

Civil Code Study Commission Comments, 1 W. Harvey, Indiana Practice at 298 (1969). In his early comments on the rule, Dean Harvey noted that the obvious impact of the rule would be to greatly extend the long-arm jurisdiction of the Indiana courts. With regard to subsection (1), he commented:

"This section represents an attempt to extend the jurisdiction of the local courts to the constitutional limit. Of course the problem of interpreting just what constitutes 'doing business' is always present. . . .

　　*　　*　　*　　*　　*　　*

`　But of course the possibility for judicial construction in this section is very wide. The question is whether the older and more restrictive cases on 'doing business' shall control in this jurisdictional statute, when it is clear that the purpose of the whole statute, that is Rule 4.4, is to extend the jurisdictional power of the Indiana court and Indiana litigant to the constitutional maximum. In short, to bring Indiana and its court-jurisdictional power into line with the obvious trend in other states, and to assert for Indiana its full constitutional power."

1 W. Harvey, Indiana Practice, at 308 (1969).

Our federal courts have given the rule a liberal construction. In *Valdez v. Ford, Bacon and Davis, Texas, Inc.,* (N.D.Ind.1974) 62 F.R.D. 7, 14, a products liability action against the manufacturer and installer of a sulphur recovery unit for personal injuries suffered in this state, the federal district court opined:

"This court fully agrees with the comment of Dean Harvey that Indiana Trial Rule 4.4 is intended to extend personal jurisdiction of courts sitting in this state, including this one in this case, to the limits permitted under the due process clause of the Fourteenth Amendment."

It held the manufacturer subject to the jurisdiction of the court under any or all of three different subsections of T.R. 4.4(A):

(1), (3), or (4). This opinion has been followed and the rule applied with varying results in *Nu-Way Systems of Indianapolis, Inc. v. Belmont Marketing, Inc.*, (7th Cir. 1980) 635 F.2d 617, *Oddi v. Mariner-Denver, Inc.*, (N.D.Ind.1978) 461 F.Supp. 306, *Igleheart v. Igleheart*, (S.D.Ind.1975) 402 F. Supp. 1, *Chulchian v. Franklin*, (S.D.Ind. 1975) 392 F.Supp. 203, and *Milosavljevic v. Brooks*, (N.D.Ind.1972) 55 F.R.D. 543.

We have absolutely no reason to disagree with the statements of the above authorities regarding the manifest purpose of the rule to greatly expand the personal jurisdiction of Indiana courts. Furthermore, we have no reason to think that the phrase "doing any business" as employed in T.R. 4.4(A)(1) should be any more narrowly construed in cases involving foreign corporations than the phrase as employed in Ind. Code 23–3–3–1 has been construed. Thus we conclude that T.R. 4.4(A)(1) extends the personal jurisdiction of Indiana courts over nonresident defendants "doing any business in this state" to the limits permitted by the due process clause of the fourteenth amendment. Having so concluded, we need not perform a two-part analysis of whether the statute allows the exercise of jurisdiction over the defendant and whether that allowance accords with due process; rather, we engage in a "single search for the outer limits of what due process permits." *Oddi, supra*, at 308.

Griese-Traylor asserts that what it denominates a "single transaction" cannot confer jurisdiction. In making this determination we are not bound to apply a mechanical test based upon the quantum of contacts between the defendant and the state. As stated in *Oddi, supra*, at 309:

> "When a cause of action arises from the defendant's contacts with the forum, less is required to support jurisdiction than when the cause of action is unrelated to those contacts."

A determination of whether any particular exercise of jurisdiction comports with due process requires an inquiry into "the relationship among the defendant, the forum, and the litigation." *Shaffer, supra*, at 204.

A state cannot authorize its courts to affect any person's interest without "a rational basis for the exercise of judicial power consisting of a relation of the parties and the subject matter of the action to the state in some significant way." *Milosavljevic, supra*, at 547. The burden the defendant will bear in defending in the forum, the preservation of constitutional principles of interstate federalism, and, to a lesser extent, the interests of this state and the parties, are all material factors. *World-Wide Volkswagen Corp., supra.*

In *Suyemasa v. Myers*, (1981) Ind.App., 420 N.E.2d 1334, a case involving breaches of contracts for the sale of the capital stock of a foreign corporation to Indiana residents, the plaintiffs appealed a dismissal on the ground of lack of personal jurisdiction. The nonresident defendant seller asserted he was not doing business in this state because he had no office in Indiana and was not in the business of transferring stock or stock subscriptions. He further asserted his contacts with the state, i. e. the discussion of the sale of stock and the partial making of contracts which were the subject of these suits, were not sufficient minimum contracts. We expressed our agreement with the federal holding that T.R. 4.4(A) extends jurisdiction to the limits of the due process clause and noted that substantial negotiations in the forum state, *see Thompson v. Ecological Science Corp.*, (8th Cir. 1970) 421 F.2d 467; *Liquid Carriers Corp. v. American Marine Corp.*, (2nd Cir. 1967) 375 F.2d 951; *Tatham-Laird & Kudner, Inc. v. Johnny's American Inn, Inc.*, (N.D.Ill.1974) 383 F.Supp. 28, and purposeful activity in the state both preliminary and subsequent to the execution of a contract, *see American Contract Designers, Inc. v. Cliffside, Inc.*, (S.D.N.Y.1978) 458 F.Supp. 735; *National Gas Appliance v. AB Electrolux*, (7th Cir. 1959) 270 F.2d 472 *cert. denied*, 361 U.S. 959, 80 S.Ct. 584, 4 L.Ed.2d 542 (1960); *Unidex Systems Corp. v. Butz Engineering Corp.*, (D.D.C.1976) 406 F.Supp. 899, have been determined to be sufficient minimum contacts. We held the nonresident defendant's purposeful and repeated entries into

this state in order to discuss the sale of stock, to negotiate contract terms, and to offer to sell the stock constituted doing business in this state and satisfied due process, and reversed the dismissal.

■ We are of the opinion the maintenance of the instant suit in an Indiana court does not offend traditional notions of fair play and substantial justice. Acting in this state in the capacity of a corporate officer, Traylor negotiated and facilitated the execution of a contract for the sale and purchase of an Indiana corporation from residents of this state. The contract expressly provides it "shall be governed by and construed in accordance with the internal laws of the State of Indiana." The stock was transferred in this state, consulting services were rendered here, and partial payment, both lump sum and periodic, was made in this state. We find Griese-Traylor purposely availed itself of the privilege of doing business in this state, and affirm the trial court's exercise of jurisdiction *in personam.*

*Issues II and III.*

In addition to a lump sum payment of $450,000, paragraph 1.02 provides that "as further consideration for the sale of the capital stock" Griese-Traylor agrees to pay Floyd $300 per week for fifteen years, to pay the balance to his wife or estate in the event of his death, and to adjust these payments in accordance with annual cost-of-living increases as measured by the federal government.

As noted in our statement of the facts, Floyd continued to render consulting and/or managerial services to Lemmons and Company from September of 1974 until August of 1976. He received weekly payments, thrice adjusted, from September of 1974 until December 21, 1976. At trial Griese-Traylor asserted these payments had been tendered as compensation for services rendered, and further, that by his actions and apparent aquiescence in this arrangement, Floyd had released Griese-Traylor from its obligation to make periodic payments. The trial court found otherwise:

"6. The payments made by the defendant to plaintiffs pursuant to paragraph 1.02 of the contract on a weekly basis are as further consideration for the sale of the capital stock by plaintiffs to defendant." [4]

On appeal Griese-Traylor asserts the trial court erred in so finding and argues the evidence clearly shows that these payments were made by Lemmons and Company as compensation for services rendered "pursuant to Article VI" of the contract.

Our review is guided by Ind. Rules of Procedure, Trial Rule 52(A) which provides in pertinent part:

"On appeal of claims tried by the court without a jury or with an advisory jury, at law or in equity, the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

*See also* Ind. Rules of Procedure, Appellate Rule 15(N). The trial court's finding is based upon the unambiguous language of the contract. We will not disturb it unless the corporation can show it to be clearly erroneous, *Fisel v. Yoder*, (1974) 162 Ind. App. 565, 320 N.E.2d 783; that is, we must be brought to a definite and firm conviction

---

4. The trial court also found:

"3. That pursuant to the terms of said contract the defendant has made payment to plaintiffs under the contract in the sum of Four Hundred Fifty Thousand Dollars ($450,-000) and further has made payments for one hundred twelve (112) weeks at the weekly rate of Three Hundred Dollars ($300) plus accelerated adjustments in the cost of living with the last weekly payment made at the rate of Three Hundred Thirty Nine Dollars and 91/100 ($339.91).

4. That no payments have been made upon the contract pursuant to its terms to plaintiffs by defendant since December 21, 1976, and there remains under the terms of said contract to be paid by defendant to plaintiffs six hundred sixty-eight (668) weekly payments at the rate of Three Hundred Thirty-nine Dollars and 91/100 ($339.91) per week."

that a mistake has been committed, *Young v. Bryan*, (1977) Ind.App., 368 N.E.2d 3.

■ Article VI, consisting of a single paragraph numbered 6.01, provides:

"Except as a consultant of the Company, 'Seller' shall not directly nor indirectly engage in any business in competition with the business as conducted by the Company, either as an individual or as an employee or officer of any other firm or corporation for a period of fifteen (15) years from the closing date hereunder within an area of two hundred (200) miles of the City of Evansville, Indiana."

Griese-Traylor claims this section evidences an understanding among the parties that Floyd would render consulting services to the corporation. On direct examination defense counsel attempted to introduce evidence of agreements or negotiations precedent to the signing of the contract by posing the following question to Ferris Traylor:

"Q. Was anything said at the time prior to the signing of the contract about employment with Lemmons and Company, Inc.?
MR. LONG: We would object to that your Honor, on the grounds that he is now attempting to modify the terms of the contract by virtue of oral testimony and that the contract will stand on its own. It would be a violation of the Parol Evidence Rule.
MR. STAYMAN: Your Honor, . . .
COURT: Sustained.
MR. STAYMAN: Your Honor, could I reply to that?
COURT: No."

Griese-Traylor argues the trial court erred in excluding the evidence, citing authority for the general propositions that parol evidence is competent to prove collateral, independent parol agreements and that parol evidence is competent to show failure of consideration or a lack thereof. The Lemmonses counter that the corporation failed to make an offer to prove, Ind. Rules of Procedure, Trial Rule 43(C). Griese-Traylor replies that counsel was not permitted to preserve the error although he clearly attempted to do so. We must agree with the Lemmonses. Counsel was most certainly denied the opportunity to reply to the objection; however, this denial did not preclude his making an offer to prove. Any error was waived. *Christian Super Chevrolet Corporation v. State*, (1976) 169 Ind.App. 143, 346 N.E.2d 602.

■ Secondly, Griese-Traylor draws our attention to the fact that the paragraph 1.02 payments and the paragraph 6.01 covenant both run fifteen years. Adding to this the rather ungainly reference to Mr. Lemmons as consultant and the fact that the payments were tendered in the form of corporate payroll checks, Griese-Traylor maintains the position that "Mr. Lemmons was to render services as a consultant to Lemmons and Company," and that the $300 per week payments were compensation for services rendered.

Interestingly, the argument is taken no further. Griese-Traylor pulls up short of the position that an employment contract exists within the four corners of the document; the corporation has not provided an explanation of how the balance of payments are to be tendered to Margaret or the estate on the event of Floyd's death. The argument fails to persuade us the trial court's finding is erroneous.

Finally, assuming *arguendo* the payments were originally intended to constitute further consideration for the purchase of the capital stock, Griese-Traylor argues the actions of the parties in treating the payments as compensation for services rendered modified the contract. Citing *Armour and Company v. Anderson*, (1943) 114 Ind.App. 485, 489, 51 N.E.2d 496, 497, Griese-Traylor argues the evidence leads only to the conclusion "that appellant clearly intended to make a new agreement with appellee which was to take the place of the old one."

In *Armour, supra*, the appellee, a purchasing agent, had grudgingly acquiesced in a reduction in his per-unit commission by accepting payments of a lesser amount for a number of years. The court held:

"The conduct of appellee for a period of more than seven years bespeaks a like intent and an acceptance of the new agreement in the place of the old.

By the weight of authority the facts of the instant case clearly show an executed accord and satisfaction amounting to a novation."

114 Ind.App. at 489, 51 N.E.2d at 497.

Given the disparity in the facts and the law, we consider *Armour, supra,* inapposite, except for the general proposition that a contract can be modified by the subsequent actions of the parties. The record of the case at bar clearly shows the payments were tendered in accordance with the arrangements between, or the best interests of, Griese-Traylor and/or its owners: The lump sum payments were made from the personal account of Ferris and Mary Traylor; the periodic payments were made from the operating account of the newly acquired corporation. In fact, Floyd never objected to the manner in which any particular payment was tendered. However, the trial court rejected the argument that Floyd's acceptance of periodic payments in the form of payroll checks modified the agreement so as to replace a stated consideration with a contract of employment, and we are not persuaded that the trial court erred in so doing.

*Issue IV.*

■ In their complaint the Lemmonses alleged Griese-Traylor had "defaulted" and claimed damages in the amount of $227,059.88, that being the sum of 668 weekly payments of $339.91. In effect they asked the trial court to accelerate the installment obligations. The trial court found the last payment had been tendered on December 21, 1976 and there remained to be paid 668 weekly payments. The trial court concluded as a matter of law Griese-Traylor had breached the terms of the contract, and, as a result of the breach, all 668 payments were due and owing. In effect the court accelerated the installment obligations.

On appeal Griese-Traylor asserts the trial court erred in awarding excessive damages. With regard to the court's conclusion of law that $227,059.88 is "due and owing," Griese-Traylor argues "Indiana has long held that acceleration is available only 'when the obligation contains such a provision maturing the debt,' *Voris v. Ferrell,* (1913) 57 Ind. App. 1, 103 N.E. 122, 126." Griese-Traylor also points out that courts in another jurisdiction have "rightfully held" no suit may be brought for future payments in the absence of a clause permitting acceleration, citing *Maflo Holding Corporation v. S. J. Blume, Inc.,* (1955) 308 N.Y. 570, 127 N.E.2d 558.

The contract indeed does not contain an acceleration clause. Griese-Traylor exaggerates, however, in stating our courts have "long held" acceleration is available only when the contract provides for it. *Voris, supra,* does not so hold, and we have neither been directed to nor discovered such a positive holding in Indiana case law. It would be correct to state we have long accepted and enforced fair and reasonable acceleration clauses in notes and mortgages, *Moore v. Sargent,* (1887) 112 Ind. 484, 14 N.E. 466; *Cowan v. Murphy,* (1975) 165 Ind.App. 566, 333 N.E.2d 802; *Voris, supra; Kerbaugh v. Nugent,* (1911) 48 Ind.App. 43, 95 N.E. 336. We have held that a cause of action accrues and the statute of limitations begins to run on installment obligations as each installment becomes due, *Kuhn v. Kuhn,* (1980) Ind., 402 N.E.2d 989, as a mandatory acceleration clause brings all payments due immediately, *Cowan, supra,* or as an optional acceleration clause is exercised, *Central Trust and Savings Co. v. Kirkman,* (1920) 73 Ind.App. 633, 127 N.E. 452, Cf. *Roberts v. Watson,* (1977) 172 Ind.App. 108, 359 N.E.2d 615 (action for rent cannot recover rent not alleged to be due); *Booher v. Richmond Square, Inc.,* (1974) 160 Ind.App. 44, 310 N.E.2d 89 (action for rent maintainable only as rent becomes due). We hold the trial court erred in accelerating the installment obligations.

In its brief Griese-Traylor addresses the issue of anticipatory repudiation, which it assumes *arguendo* might provide an alternative basis for the court's judgment. Even if we were to assume *arguendo* the

doctrine of breach by anticipatory repudiation applies in a case involving a unilateral obligation for the payment of money,[5] the absence of a special finding of fact regarding an unequivocal manifestation of an intention of the part of Griese-Traylor not to perform at the times fixed in the contract precludes an affirmance on that basis. *Indiana Life Endowment Co. v. Reed*, (1913) 54 Ind.App. 450, 103 N.E. 77.

We are of the opinion that upon this final determination of Griese-Traylor's liability the payments will be made pursuant to the terms of the contract. Henceforth, nonpayment will support a summary cause of action for the amount accrued. *See Ragnar Benson, Inc. v. Wm. P. Jungclaus Co.*, (1976) 167 Ind.App. 628, 352 N.E.2d 817, and *Booher, supra*, regarding estoppel by verdict or finding.

We affirm the court's award of damages for the admitted partial breaches of contract resulting from Griese-Traylor's failure to make payments after December 21, 1976; we reverse the award of damages for the balance of payments due over the years.

Affirmed in part, reversed in part.

ROBERTSON and RATLIFF, JJ., concur.

---

**5.** The courts of this state have long applied the doctrine of breach by anticipatory repudiation in cases involving executory, bilateral contracts. *Indiana Life Endowment Company v. Carnithan*, (1915) 62 Ind.App. 567, 109 N.E. 851. However we have found no Indiana case law on the limitation of the doctrine's applicability. It is undoubtedly the majority view that when a bilateral contract has become, by the full performance of one party, a unilateral obligation to pay a fixed amount of money at a fixed time or times, an anticipatory repudiation of the obligation does not permit an action for payments which have not matured. Restatement of the Law, *Contracts* §§ 316–318 (1941); 11 Williston §§ 1326–1330 (1968); 4 Corbin §§ 962–969 (1951); Calamari and Perillo § 184 (1970). However, there are excellent arguments to be made against the limitation of the doctrine's applicability. 4 Corbin § 964 *et seq.*; Calamari and Perillo § 184.